UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                          )
UNITED STATES             )
                          )
        v.                )
                          )        No. 05CR10010-NMG
SEVERIN YELAUN            )
                          )
_____)

## DEFENDANT'S SENTENCING MEMORANDUM

### Introduction

Defendant, Severin Yelaun, was found guilty on December 15, 2006, of 26 counts of mail fraud, in violation of 18 U.S.C. § 1341, 1 count of health-care fraud in violation of 18 U.S.C. § 1347, 1 count of conspiracy in violation of 18 U.S.C. § 371, and 1 count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956 (h).

The calculation in the Presentence Report (PSR) of the defendant's total offense level is a level 24. The defendant served his objections to the PSR on March 20, 2007. The objections focus on two aspects of the calculation in the PSR: (1) the 10-level increase for the Amount of Loss (calculated to be between $120,000 and $200,000) pursuant to §2B1.1(b)(1)(F); and (2) the 4-level increase for the defendant's Role in the Offense, based on the conclusion that the defendant was a leader or organizer of a criminal activity that involved 5 or more participants or was otherwise extensive pursuant to §3B1.1(a).

For the reasons stated below, the PSR's conclusions in these two respects erroneously increase the defendant's total offense level. It is the defendant's position that the correct Amount of Loss is approximately $22,747, and the correct Role in the Offense adjustment should be a 2-level rather than 4-level increase, because the defendant was not an organizer or leader and the criminal activity was not otherwise extensive. Therefore, the defendant's total offense level should be 16 rather than 24.

## A. <u>Amount of Loss</u>

The calculation in the PSR for the amount of loss is $179,534.74, which increases the defendant's offense level by 10 levels pursuant to §2B1.1(b)(1)(F). The loss in the PSR is reached by adding up the total amount of each health insurance claim form (HICF) submitted to an insurance company for diagnostic tests related to patients the government has chosen to include in its calculation of loss. All of the charges on the claim forms are related to one of two diagnostic tests, a needle electromyogram test (EMG) and a nerve conduction velocity test (NCV). The defendant objects to the calculation in the PSR because it includes charges for both EMGs and NCVs, although the evidence establishes that only the charges for EMG tests were fraudulent because they were not performed. The total cost for

2

these fraudulent EMG tests in the government's list of patients
is approximately $22,747[1], which would warrant an increase of
only 4 levels pursuant to §2B1.1(b)(1)(C).

The evidence presented by the government at trial
established only that defendant submitted bills to insurance
companies for EMG tests that were not performed.  On the other
hand, it was undisputed that the NCV tests for which the
companies were billed were, in fact, performed.  Thus, the
testimony of all of the patients was consistent with their having
been given NCV tests, in which electrodes were attached to
different parts of their bodies and they received shocks.  The
PSR contains a section entitled "EMG Test," where the unique
attributes of the EMG test are described at length. (PSR ¶¶ 5-7).
Unlike the NCV, the EMG requires the insertion of needles into
the patient.  (PSR ¶ 5).  The EMG, unlike the NCV, also requires
the interpreting physician to be present in the room while the
test is administered. (PSR ¶ 7).

Furthermore, there is no claim in the PSR that NCV tests
were not performed, despite the fact that the bills for such
tests make up approximately $150,000 of the Amount of Loss

---

[1] Defendant does not have the health insurance claim forms
for seven of the patients listed on the government's chart.
However, the highest cost for an EMG among the other patients is
$631.  Were each of these seven to have had a $631 EMG it would
raise the total calculation by $4,417 from $22,747 to $27,164, an
increase that would not affect the defendant's amount of loss
category under the guidelines.

calculation.  The PSR does not even mention the amounts billed for NCV tests in the sections entitled "The Fraudulent Global Tech Billings" and "The Fraudulent Lynn Diagnostics Billing." (PSR ¶¶ 8-14).

The defense anticipates the government will argue at sentencing that because the results of the EMG and NCV tests appear on the same report, and it was proved that various reports were fraudulent, that the charges for the NCVs were just as fraudulent as the EMGs.  However, the testimony at trial directly refutes such a conclusion in at least two respects.  First, as stated, every patient testified to having received what was clearly an NCV.  Second, Michael Bousa an NCV technician testified that he performed hundreds of NCVs for Global Tech and Lynn Diagnostics.  Unlike the EMGs, which Dr. Chattergee testified he did not perform for Global Tech, he testified he regularly signed off on NCVs performed by Michael Bousa.  The charges for the NCVs should therefore not be included in the amount of loss and a 4-level rather than a 10-level increase is the appropriate adjustment for the Amount of Loss.

### b. Role in the Offense

The PSR recommends a four-level increase pursuant to §3B1.1(a) for Role in the Offense on the ground that the defendant was an individual who "was an organizer or leader of a

4

criminal activity that involved five or more participants or was otherwise extensive..."  §3B1.1(a).

In order to warrant an increase of four levels for the defendant's Role in the Offense, the Court must make two determinations.  First, there must be a finding that the defendant was an organizer or leader of the criminal activity at issue.  Second, the Court must find that the criminal activity involved five or more participants or was otherwise extensive. United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).  This latter determination of scope is necessary for either a four-level or a three-level increase under §3B1.1.

In the PSR, it is conceded that there were not five or more participants involved in the criminal activity.  (PSR, Probation Officer's Response to Objection #8, p. 32).  The recommendation for a four-level increase is, therefore, predicated on the "otherwise extensive" clause of the guideline.  However, the criminal activity in this case involving, at most, a handful of people is not of the scope to justify a three or four-level increase.

The determination of extensiveness should take into consideration "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme."  United States v. Dietz, 950 F.2d 50, 53 (1st Cir 1991).

5

The health care fraud in this case involved submitting bills for
EMGs that were not performed out of two clinics, Global Tech and
Lynn Diagnostics, at different periods of time.  At Global Tech,
other than the co-defendants, the only other individuals involved
were a technician who performed NCVs and those who did the
billing, which at any point in time was approximately one or two
people.  In total, there were only approximately six or seven
people involved over a lengthy period of time.  The defendant's
participation at Global Tech lasted for approximately ten months
and his participation at Lynn Diagnostics lasted approximately a
year.

        The criminal activity was minimal when considered in the
context of health care fraud.  By virtue of the nature of the
crime, health care fraud necessarily entails a greater level of
complexity than other crimes.  At a minimum, there will be a
physician and the physician's staff who prepare and send out
bills to insurance companies.  Since, the enterprise in the
present case involved little more than that minimum, the criminal
activity here cannot justify a three or four-level increase
beyond what the guidelines call for in the ordinary case.

        The activity in the present case does not come close to the
sprawling criminal enterprises that have been considered to be
"extensive."  See e.g., United States v. Dietz, 950 F.2d 50, 54
(1st Cir 1991) ("countless employees of the government offices,"

a "course of criminal activity [that] spanned twelve years," "crossed into seven states," and "snared eight different governmental agencies in its intricately spun web..."

### Organizer or Leader

Even if the Court were to find that the criminal activity was extensive, the defendant was not an organizer or leader and therefore the adjustment should be three rather than four levels pursuant to §3B1.1(b).

Section 3B1.1 requires a four-level adjustment when the defendant is deemed to be an organizer or leader while a three-level adjustment is called for if the defendant was only a manager or supervisor.  The commentary to section §3B1.1 indicates that "'[t]his adjustment is included primarily because of concerns about relative responsibility.'" United States v. Tejada-Beltran, 50 F.3d at 111 (1st Cir. 1995) "Because the sentencing Commission envisions large-scale criminal activities as hierarchical, the guidelines punish the persons atop the pyramid more severely based on their relative responsibility." Id. at 111.

Although the defendant was certainly involved in the criminal activity at Global Tech, he was not a leader or organizer.  At the time, the defendant was 24 years old, approximately half the age of his co-defendant Igor Moyseyev, who

financed the venture and was clearly in control of the clinic and its activities.  He was the ultimate decision-maker, and when ranking those involved in the hierarchy he, not the defendant, was at the top.  The description of defendant's role is more accurately captured by §3B1.1(b) than §3B1.1(a).

With respect to Lynn Diagnostics, there was very little evidence presented at trial as to the participants.[2]  But, in any event, it was a smaller operation than Global Tech and does not satisfy the requirement of being "otherwise extensive" pursuant to §3B1.1(a) or (b).  Accordingly, with respect to Lynn Diagnostics, even if the Court finds that the defendant was a leader or organizer there, that clinic does not meet the extensiveness requirement for either a 3 or 4 level increase.

## Conclusion

For the foregoing reasons, the Court should find that the adjusted offense level is 16, and impose a sentence within the range of 21 to 27 months.

----

[2] Various of the individuals related to that clinic were on the government's witness list, but they did not testify at trial.

Respectfully submitted,

/s/ *Jonathan Shapiro*
Jonathan Shapiro
BBO # 454220
Patricia Garin
BBO # 544770
Jeffrey Wiesner
BBO # 655814
Stern Shapiro Weissberg
& Garin, LLP
90 Canal Street
Boston, MA 02110
(617) 742-5800

Dated: April 6, 2007