UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>v.   )<br>)<br>**SEVERIN YELAUN,** )<br>)<br>**Defendant** ) | Criminal No. 05-10010-NMG |

**GOVERNMENT'S RESPONSE TO YELAUN'S SENTENCING MEMORANDUM**

A.  <u>The PSR correctly calculated the amount of loss</u>.  The PSR correctly calculated the amount of loss by including all EMG/NCV-related charges that were based on reports (1) stamped with Dr. Chatterjee's signature stamp, or (2) signed by Dr. Montoni.  Dr. Chatterjee testified that all EMG/NCV reports bearing his signature stamp were fraudulent.  Dr. Montoni likewise testified that he never performed any EMG or NCV tests and did not even know how to perform them.  Many of the Chatterjee-stamped and Montoni-signed EMG/NCV test reports bore identical test results, corroborating the testimony that they were fraudulent.  Since the PSR based its loss calculation entirely on claims supported by fraudulent EMG/NCV reports, the loss calculation is correct.

The government is baffled by Yelaun's contention that "it was undisputed [at trial] that the NCV tests for which the [insurance] companies were billed were, in fact, performed."  The opposite is true.  All of the patients who were called to the stand testified that they did not receive a test involving a

series of up to 50 painful shocks being administered to their extremities with electrodes.  They stated only that they received mild electrical stimulation from pads that were placed on areas where they had experienced muscle strain.  Yelaun's claims to the contrary are simply incorrect.  The evidence at trial proved that none of the NCV tests included in the loss calculations were actually performed; and if any were performed, they were not performed by Dr. Chatterjee or Dr. Montoni, contrary to the signature appearing on the test reports used to support the bills.

    B.   <u>The PSR correctly awarded four levels for role in the Offense</u>.  Paragraphs 38-41 of the PSR amply document Yelaun's role as a leader and organizer of the offense.  When Yelaun and Moyseyev first met, Yelaun was already an expert in the management of health care clinics; Moyseyev, in contrast, was an investor who spoke poor English and had no prior training or experience in the medical services industry.  Yelaun came up with the idea of creating Global Tech and the Chelsea clinic.  Although Moyseyev, as the person supplying the capital, incorporated Global Tech and owned it, Yelaun considered himself a full partner entitled to a share of the profits.  Moreover, Yelaun led and organized the clinic:  he hired doctors and technicians to perform the EMG tests, recruited patients, oversaw the scheduling of the tests, and trained and supervised the clerical staff who billed for the tests.  In particular, he is

the person who tried to recruit Dr. Chatterjee to perform EMG tests at the clinic (and later admitted to the use of Dr. Chatterjee's signature stamp), and he is the person who persuaded Dr. Montoni to sign fraudulent EMG/NCV tests.

The PSR also correctly determined that the criminal activity led and organized by Yelaun was "otherwise extensive." The guidelines explain that,

> [i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

USSG 3B1.1, comment. (n.3). Yelaun's fraudulent scheme plainly involved "many outsiders," including at least half a dozen billing agents and employees, dozens of insurance company representatives, and scores of patients. The cost to these innocent individuals, legitimate businesses, and society, from Yelaun's fraud is appropriately reflected in the four-level adjustment for role in the offense.

C. <u>Yelaun should receive a sentence at the high end of the guidelines range.</u> Yelaun should receive a sentence at the high end of the guidelines range to reflect the vast cost to society of his personal greed. Yelaun was a competent businessman with sufficient skills and resources to make a good living. He had many advantages, including devoted parents, a good education, and friends willing to help and support him. There was no excuse for

his criminal conduct in this case other than pure greed. His goal was to make easy money, and he did so at vast cost to individuals, legitimate businesses, and society. Yelaun took advantage of Dr. Montoni during a difficult time in Dr. Montoni's life, effectively destroying the career of a hardworking medical professional who had never been in trouble before then. He inconvenienced scores of patients and insurance company representatives who had to appear for interviews, grand jury appearances, and trial testimony, and he cost the government enormous time and resources during its investigation and prosecution of him. Finally, he victimized all Massachusetts automobile owners by engaging in the kind of fraud that results in higher insurance premiums for all drivers.

Yelaun's guidelines calculations do not begin to reflect the actual losses he inflicted on innocent individuals, legitimate businesses, society, and the government. The Court should impose a sentence at the high end of the guidelines range in order to do justice in this case.

                                         Respectfully submitted,

                                         MICHAEL J. SULLIVAN
                                         United States Attorney

                              By:  /s/ William Weinreb
                                    WILLIAM D. WEINREB
                                    GREGG D. SHAPIRO
                                    Assistant U.S. Attorneys

Dated:  April 9, 2007