UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * *
*UNITED STATES OF AMERICA    *
                            *    CRIMINAL ACTION
         v.                 *    No. 05-10010-NMG
*                           *
SEVERIN YELAUN             *
                           *
* * * * * * * * * * * * * *

BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE AND A JURY
JURY TRIAL DAY 7, Morning Session
December 12, 2006

APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE, (By AUSA William
D. Weinreb and AUSA Gregg D. Shapiro) 1 Courthouse Way,
Suite 9000,  Boston, Massachusetts  02210, on behalf of
the United States of America

        STERN, SHAPIRO, WEISSBERG & GARIN, (By Jonathan
Shapiro, Esq., and Jeffrey Weisner, Esq.) 90 Canal
Street, Boston, Massachusetts   02114-2022, on behalf of
Defendant

                              Courtroom No. 4
                              1 Courthouse Way
                              Boston, Massachusetts 02109

                    James P. Gibbons, RPR, RMR
                       Official Court Reporter
                    1 Courthouse Way, Suite 7205
                    Boston, Massachusetts  02210
                         (617) 428-0402

PDF created with pdfFactory trial version www.pdffactory.com

```
1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Good morning.

4        Counsel wanted to see the Court before we start?

5            MR. JONATHAN SHAPIRO:  Yes, Judge.

6        Yesterday after court I requested that Mr. Weinreb

7   produce the presentence report that was prepared in

8   connection with --

9            THE COURT:  The presentence report?

10           MR. JONATHAN SHAPIRO:  The presentence report

11  prepared in connection with Dr. Montoni's plea, on the

12  ground that the direct examination not only involved

13  questions of his involvement in this particular crime, but a

14  number of other issues were raised on direct examination,

15  such as the offender characteristics, Dr. Montoni's

16  background, mental health background, employment background,

17  various other things, all of which are dealt with in the

18  presentence report.

19           And the presentence report, I submit, is likely to

20  contain statements by Dr. Montoni that are related to the

21  subject matter of his testimony and, therefore, should be

22  produced by the government.  The government, I believe, is

23  in possession of the report.  I think the report clearly is

24  pertinent on a number of these matters, and I think I'm

25  entitled to review it in connection with the
```

PDF created with pdfFactory trial version www.pdffactory.com

1    cross-examination of Dr. Montoni.

2        Mr. Weinreb took the position that he would not

3    produce that report and that he has no obligation to do so,

4    and I wanted to raise that.

5            THE COURT:  Mr. Weinreb?

6            MR. WEINREB:  Your Honor, first, although I

7    have heard that the presentence -- the initial presentence

8    report has been prepared, I have not actually seen it.  I

9    have not been back to my office, which is in the Williams

10    Building, since this case began.  So I haven't looked at my

11    mail.  I have been staying in this building for convenience.

12    So I haven't seen it.  I don't know what's in it.

13        Even if the government had a copy, my understanding

14    is that the presentence report is a confidential document

15    that is produced at the request of the Court by the United

16    States Probation Office for the Court's use, that it is not

17    a statement of the defendant.  It's not a statement that is

18    signed or otherwise adopted by him or a verbatim transcript

19    of his statements; but it's a collection of information that

20    the Probation Office collects from a variety of sources.

21    It's filled with hearsay, double hearsay, research that the

22    Probation Office undertakes, and it's all put in there.

23        In this particular case, because of the early phase

24    of the PSR, it hasn't even by reviewed by the parties.

25    Dr. Montoni has not -- there have been, to my knowledge, no

PDF created with pdfFactory trial version www.pdffactory.com

1  objections filed to it.  He certainly hasn't been asked by

2  the Court whether he objects to any part of it, whether he

3  adopts it or doesn't adopt it.  It's simply a document, a

4  collection of information gathered by the Probation Office

5  on behalf of the Court.  It's not a government document, and

6  it's my position that it's not -- I mean, although I'm sure

7  it would be useful to the defense to have the benefit of all

8  Probation's work in digging up information about

9  Dr. Montoni, it's simply not something they are entitled to

10 under Rule 16, under the Jencks Act, or any other rule of

11 evidence.

12             THE COURT:  I don't know of any precedent,

13 Mr. Shapiro.  Do you have any case law to back you up where

14 other sessions of this court, or any other court, has

15 allowed the production of a presentence report before the

16 final report is issued, much less the final report itself?

17             MR. JONATHAN SHAPIRO:  Number one, I don't

18 think it is particularly relevant whether it's the

19 preliminary report or the final report.  I believe it

20 contains statements of Dr. Montoni, and just like any other

21 statement, he can deny it or indicate it's not accurate or

22 whatever.

23             THE COURT:  Do you have any precedent that

24 determines the PSR to be discoverable?

25             MR. JONATHAN SHAPIRO:  Well, the only thing I

1    can say, and I haven't had the time to actually research it,

2    is I do know that in other cases that I've tried I have had

3    that produced, at least portions of that in this court, and

4    that's --

5            THE COURT:  Well, all right.  I am not going

6    to require the government to produce whatever they have,

7    whether it be a preliminary report or a final PSR.  I will

8    consider the matter further, and will be glad to receive any

9    enlightenment that you or your colleagues can provide for me

10   in the intervening time.  And if I determine at a later time

11   that it is discoverable, I will allow you to recall

12   Dr. Montoni to examine him on this, but I am not going to

13   require the production of it now.

14           All right.  So we'll proceed with the jury.

15           Please call the jury.

16           (Pause in proceedings.)

17           (Whereupon, the jury entered the courtroom.)

18           THE COURT:  Good morning, jurors.

19   We're ready to resume.

20   Dr. Montoni will be recalled to the witness stand.

21                   **JOHN MONTONI, resumed**

22           THE COURT:  Good morning, Dr. Montoni.  You

23   are reminded that you remain under oath.  Please be seated,

24   and Mr. Shapiro will conduct cross-examination.

25                   **CROSS-EXAMINATION**

BY MR. JONATHAN SHAPIRO

Q   Good morning, Dr. Montoni.

A   Good morning.

Q   Now, Dr. Montoni, you're here in court this morning
because of a deal you made with the government, correct?

A   No.

Q   What was that answer?

A   No.  I don't believe so.

Q   You say you didn't make a deal with the government?

A   I agreed --

Q   Is that your testimony?

A   I agreed to tell the truth, and that was the only
agreement that I have made with them.

          THE COURT:  Dr. Montoni, would you pull that
microphone closer to you, please.

          THE WITNESS:  Sure.

Q   You have a plea agreement in this case, correct?

A   Yes, I do.

Q   And that plea agreement was negotiated between you and
the government over a course of many months; wasn't it?

A   Yes.

Q   And you didn't arrive at an agreement, a plea agreement,
until September 26 of this year, or thereabouts?

A   Correct, but I've never --

Q   Just answer the question.

```
1    A   Correct.

2    Q   September 26 of this year was the date you came into

3    court, correct?

4    A   Yes.

5    Q   And this agreement was presented to the Court, correct?

6    A   Yes.

7    Q   And you pleaded guilty?

8    A   Yes.

9    Q   And in return for that plea of guilty, the government

10   made a number of concessions, didn't they?

11   A   Yes.

12   Q   So you agreed to plead guilty, and the government agreed

13   to provide certain concessions to you, correct?

14   A   Yes.

15   Q   You don't think that's a deal?

16   A   It is a deal.

17   Q   It is a deal.

18           And the reason you entered into that deal was

19   because you were facing a very serious charge, were you not?

20   A   I believe that the question is split into two there.

21   Q   Let me ask you this.

22           Were you indicted in this case?

23   A   Yes.

24           But going back --

25   Q   Just answer the question.
```

```
 1              Were you indicted?
 2   A    Yes.
 3   Q    You were indicted in an indictment which charged you
 4   with a number of different offenses, didn't it?
 5   A    Yes.
 6   Q    And this was, as you recall, an indictment that was 104
 7   pages long.  Do you remember that?
 8   A    Yes.
 9   Q    And in this indictment you were charged with a number of
10   different offenses, correct?
11   A    Correct.
12   Q    And in Count 1 through 37 of the indictment, you were
13   charged with 37 Counts of mail fraud, weren't you?
14   A    I believe so.
15   Q    And do you know the penalty for each count of mail
16   fraud?
17   A    No.
18   Q    You understand, do you not, that mail fraud is
19   punishable under Title 18, Section 1341, of the United
20   States Code?
21   A    Yes.
22   Q    And each count of mail fraud carries a possible sentence
23   of imprisonment of up to 20 years per count, correct?
24   A    Yes.
25   Q    And you're charged with 37 counts -- or you were charged
```

1    with 37 counts in the indictment, correct?

2    A    Correct.

3    Q    And you were also charged with a number of counts of

4    what's called wire fraud, correct?

5    A    Correct.

6    Q    And you know that wire fraud is also punishable by up to

7    20 years for each count, correct?

8    A    Correct.

9    Q    And you were charged with 38, 39 -- three counts of wire

10   fraud, correct?

11   A    Correct.

12   Q    And then you were charged in Count 41 with committing

13   health care fraud, correct?

14   A    Yes.

15   Q    And that's in violation of Title 18, Section 1347, which

16   carries a maximum imprisonment of up to 20 years, correct?

17   A    Yes.

18   Q    Now, when you made your deal with the government, the

19   government said that you could plead to only one count of

20   this indictment, correct?

21   A    Yes.

22   Q    And that one count was a count of conspiracy to commit

23   health care fraud, correct?

24   A    Yes.

25   Q    And that count contains a maximum, or provides for a

```
 1   maximum, of only five years in prison, right?
 2   A    Correct.
 3   Q    And the government agreed to dismiss all of these other
 4   counts in return for your agreement to plead guilt to just
 5   one count, correct?
 6   A    Yes.
 7   Q    So that's part of the deal, right?
 8   A    Correct.
 9   Q    So by entering into the deal, you avoid being prosecuted
10   and possibly convicted of numerous counts of fraud
11   containing or calling for imprisonment on each count of up
12   to 20 years in return for your pleading guilty to a single
13   count with possible imprisonment of only five years,
14   correct?
15   A    Yes.
16   Q    So that's what the government -- one of the things the
17   government offered you, correct?
18   A    Yes.
19   Q    In return you offered something to the government,
20   didn't you?
21   A    What is that?
22   Q    Well, didn't you agree to provide substantial assistance
23   to the government in the prosecution of Mr. Yelaun?
24   A    I agreed to testify to the truth.
25   Q    My question is, in your plea agreement, isn't it true
```

1    that you agreed to provide substantial assistance to the

2    government?

3    A    As far as I know, I just agreed to testify.

4    Q    Dr. Montoni, I'm going to put on the screen a document

5    which has been marked as Exhibit 39, and I'm going to ask

6    you to look at the bottom of that document where it says

7    "Substantial Assistance."

8         Do you see that?

9    A    Yes.

10   Q    You see it says, In the event that the defendant

11   provides substantial assistance in the investigation or

12   prosecution of another person who has committed a criminal

13   offense, the US Attorney agrees that at or before the time

14   of sentencing, the US Attorney will make a motion under 5K1

15   of the Sentencing Guidelines so that the sentencing court

16   may impose a sentence below that which otherwise would be

17   required under the relevant statutes.

18   A    Correct.

19   Q    Do you see that?

20   A    Yes, I do.

21   Q    So that means, does it not -- and let me put it this

22   way.  You understood that to mean that if you provided

23   substantial assistance in the prosecution of Mr. Yelaun,

24   that the government would file a motion in court which would

25   allow the judge to impose a sentence that was lower than

PDF created with pdfFactory trial version www.pdffactory.com

1    what he would otherwise be required to impose, correct?

2    A    Yes.

3    Q    So that's what's I mean by "substantial assistance."

4    You agreed to provide that substantial assistance, correct?

5    A    Yes.

6    Q    And you understood that if you didn't provide the

7    substantial assistance, then the government didn't have to

8    file or wouldn't file the motion, correct?

9    A    Correct.

10   Q    And you wouldn't get the benefit of that motion,

11   correct?

12   A    Yes.

13   Q    So if you didn't provide substantial assistance, you

14   wouldn't get any benefit from this deal?

15   A    Yes.

16   Q    And you understand, do you not, that it's up to the

17   government to decide whether your assistance is substantial,

18   correct?

19   A    Yes.

20   Q    So if the government says, we don't think that you

21   provided enough help, they wouldn't file the motion.  You

22   understood that, right?

23   A    Yes.

24   Q    And you wouldn't get the benefit of the deal, right?

25   A    Yes.

Q    Now, in addition, you understood, and I believe you told us yesterday you understood, that there is such a thing as the Sentencing Guidelines?

A    Yes.

Q    And those Sentencing Guidelines are something which the judge, in imposing a sentence on you, is required to consider?

A    Correct.

Q    And that you understood in this case that the Sentencing Guidelines would call for you to actually serve a term of imprisonment, correct?

A    Yes.

Q    And I think you said that you understood that under the Guidelines you might have to serve a term from a year to up to three years of imprisonment?

A    Correct.

Q    And that would be what you would have to serve if you didn't provide substantial assistance, correct?

A    Correct.

Q    And that would be what you would have to serve if the government didn't recommend that the judge give you a lower sentence?

A    Yes.

Q    And you understand in this case, do you not, that if the government is satisfied with your assistance, the government

PDF created with pdfFactory trial version www.pdffactory.com

```
1    will recommend a sentence below the Guidelines?

2    A    Yes.

3    Q    And, in fact, your understanding is that there's a good

4    chance that if the government is happy with the assistance

5    you provide, they're likely to recommend a sentence where

6    you don't have to go to prison at all, correct?

7    A    Correct.

8    Q    And so that's part of the deal too, correct?

9    A    Yes.

10   Q    You come in, you cooperate with the government, you tell

11   them what they want to hear, and they will recommend that

12   you don't go to prison?

13   A    They only asked that I tell the truth.  They didn't ask

14   that I tell them what they wanted to hear.

15   Q    Well, you know it's the government that decides as to

16   whether you're telling the truth or not, right?

17   A    It's the government, the jury, and the judge.

18   Q    Well, doesn't the agreement say that it's up to the

19   government to decide whether you've provided the assistance?

20   A    In this instance, yes.

21   Q    In Exhibit 39 it says right here, The determination

22   whether the defendant -- and in this plea agreement you're

23   the defendant, right?

24   A    Yes.

25   Q    -- the determination whether defendant has provided
```

PDF created with pdfFactory trial version www.pdffactory.com

1    substantial assistance rests solely in the discretion of the

2    US Attorney and is not subject to appeal or review, correct?

3    A    Correct.

4    Q    So it's the government that says whether you told the

5    truth or not, right?

6    A    In this instance, yes.

7    Q    And if the government says we don't think you told the

8    truth or we don't like what you said, it's up to the

9    government to decide whether or not you get your part of the

10   deal?

11   A    Correct.

12   Q    So you know that you've got to please the government if

13   you're going to get your deal, don't you?

14   A    Yes.

15   Q    Now, the -- you admitted in pleading guilty to this

16   offense that you had engaged in a conspiracy to commit

17   health care fraud, correct?

18   A    Correct.

19   Q    And you admitted that you had engaged in a conspiracy

20   with Igor Moyseyev, correct?

21   A    Yes.

22   Q    And you admitted that you had engaged in a conspiracy

23   with Dr. David Tamaren, correct?

24   A    No -- no.

25                   MR. JONATHAN SHAPIRO:  May I approach the

```
 1   witness, your Honor?
 2               THE COURT:  Yes.
 3   Q   You do agree, do you not, Dr. Montoni, that you pleaded
 4   guilty to Count 42 of the indictment, correct?
 5   A   Yes.
 6   Q   I'm going to show you a copy of Count 42, and it's true,
 7   is it not, that you pleaded guilty to conspiring with Igor
 8   Moyseyev and David Tamaren, correct?
 9   A   Yes.
10   Q   And now in connection with your deal with the
11   government, you're here to claim that you also conspired
12   with Mr. Yelaun, right?  That's your testimony?
13   A   Yes.
14   Q   But you admit, do you not, that in the course of the
15   conspiracy to which you pleaded guilty, you made numerous
16   false statements?
17   A   Repeat that.
18   Q   Isn't it true that in the course of the conspiracy to
19   which you admitted, you made numerous false statements and
20   false representations?
21           You lied, correct?
22   A   Yes.
23   Q   And you lied over a period of time, correct?
24   A   Yes.
25   Q   The indictment charges you with conspiring from January
```

PDF created with pdfFactory trial version www.pdffactory.com

1    of 1999 up until 2003.  Do you recall that?

2    A    Yes.

3    Q    And you admit, do you not, that during that entire

4    period of time that you're charged with this conspiracy, you

5    committed and made numerous false statements and lies?

6    A    Yes.

7    Q    So it's fair to say that you're an admitted liar?

8    A    Yes.

9    Q    You didn't tell us yesterday whether you're presently

10   employed, are you?

11   A    I'm currently working as a professional clam digger and

12   artist.  I no longer do the chiropractic or the x-ray.

13   Q    Do you still have a chiropractic license?

14   A    No.

15   Q    Was that license revoked or suspended?

16   A    It was investigated ones I was indicted, and I

17   voluntarily surrendered it.

18   Q    So you surrendered it to avoid having it revoked?

19   A    Correct.

20   Q    Now, you've testified that you and your attorney

21   negotiated the deal that you've told us about with the

22   government's attorneys over a period of time, correct?

23   A    Yes.

24   Q    And you've met with the government's attorneys numerous

25   times to prepare for your testimony, correct?

1   A    Once.

2   Q    You met with them once?

3   A    To prepare for the testimony.

4   Q    And when you say you met with them, are you referring to

5   Mr. Weinreb and Mr. Greg Shapiro?

6   A    Yes.

7   Q    When did you meet with them?

8   A    Last Friday.

9   Q    That is last week on Friday?

10  A    Yes, correct.

11  Q    And since then have you met with them?  Did you meet

12  with them this morning?

13  A    No.

14  Q    Did you talk with them at all this morning?

15  A    (Witness shakes head.)

16  Q    And between Friday and today did you meet with them?

17  A    No.

18  Q    And how long did you meet with them last Friday?

19  A    Approximately one hour.

20  Q    During that time they went over your testimony with you,

21  correct?

22  A    Correct.

23  Q    What questions they expected to ask you and what answers

24  they expected that you would give, correct?

25  A    They went over the questions they expected to ask me,

PDF created with pdfFactory trial version www.pdffactory.com

1    and I responded, yes.

2    Q    And you discussed those answers with them, didn't you?

3    A    Yes.

4    Q    And they also talked to you about the questions that I

5    was going to ask you?

6    A    Yes.

7    Q    And they discussed with you your answers to those

8    questions, correct?

9    A    Yes.

10   Q    Now, before last Friday, had you met with these

11   government attorneys before?

12   A    Yes.

13   Q    And when was the last time before Friday that you met

14   with them?

15   A    I don't recall the date.

16   Q    Well, was it after you had pleaded guilty?

17   A    Yes.

18   Q    And that was for a lengthy period of time?

19   A    I believe again for one hour or so.

20   Q    Now, it's true, isn't it, that you haven't been

21   sentenced yet, have you?

22   A    No.

23   Q    And, in fact, your sentencing has been postponed until

24   you finish your cooperation, correct?

25   A    Correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    And so what you're sentenced to and what the government

2    recommends is going to depend, to a large extent, on how you

3    do when you testify?

4    A    Yes.

5    Q    If you do well, you may get the full deal that you

6    expect.  If not, you might not, correct?

7    A    Correct.

8    Q    So you have a real incentive on this stand to be as

9    helpful as you can to the government, don't you?

10    A    Yes.

11    Q    Now, in addition to meeting with the government's

12    attorneys over the course of months, you met with government

13    agents, FBI and Internal Revenue Service agents, on a number

14    of occasions, correct?

15    A    Yes.

16    Q    And I believe that you told us that that goes back to

17    the first time you met in August of 2002?

18    A    Correct.

19    Q    And I think you told us yesterday that from the very

20    beginning when you met with the FBI agents, and I think

21    somebody -- I think you said the district attorney or the

22    Attorney General's Office, you told us that you told the

23    truth?

24    A    Yes.

25    Q    But that's not true, is it?  You didn't tell the truth

PDF created with pdfFactory trial version www.pdffactory.com

1   every time you met with these government agents, did you?

2   A   I believe I did.

3   Q   And isn't it true that on a number of occasions when you

4   met with the government agents you told a story which you

5   thought was going to benefit you?

6   A   That's not true.

7   Q   Well, let me ask you this.

8        Do you recall when you first met with -- do you

9   remember Special Agent Don Barbee?

10   A   Not -- is that the first agent I met with?

11   Q   Yes.

12   A   Yes.

13   Q   And you recall that was the meeting that you had in

14   Friendly's in Gloucester?

15   A   Yes.

16   Q   By the way, why did you meet in Gloucester?

17   A   I lived in Gloucester.

18   Q   How long have you lived in Gloucester?

19   A   Off and on since 1992.

20   Q   Off and on since 1992.

21        What do you mean, "off and on?"  Do you have a

22   house in Gloucester?

23   A   Yes.

24   Q   Do you own the house?

25   A   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

```
1    Q    And you've owned it since 1992?

2    A    Yes.

3    Q    What's the address?

4    A    Woodward Avenue.

5    Q    In Gloucester?

6    A    Yes.

7    Q    You also have an office in Swampscott, right?

8    A    Yes, a home office at Essex Street in Swampscott.

9    Q    You don't have that any more?

10   A    No.

11   Q    But you recall yesterday you told us that that was where

12   you lived, correct?  Isn't that what you told us?

13   A    Correct.

14   Q    You didn't tell us that you had lived in Gloucester

15   since 1992?

16   A    Of and on.

17   Q    That you own a house in Gloucester?

18   A    Yes.

19   Q    That your wife and kids live in Gloucester?

20   A    They do now.

21   Q    And they have off and on since 1992?

22   A    Correct.

23   Q    When you were asked yesterday you didn't tell us that,

24   did you?

25   A    No.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    Q    You told us about how upset you were when some people

2    came to what you said was your home.

3            Do you remember that?

4    A    Correct.

5    Q    But you didn't tell us that that, in fact, was your

6    office where they came, was it?

7    A    I said it was a home office.

8    Q    But they came to your office, didn't they?  Isn't that

9    where you met with them?

10   A    Yes.

11   Q    So they didn't come to your home, they came to your

12   office, which was open to the public, correct?

13   A    Yes.

14   Q    Where you saw patients?

15   A    Yes.

16   Q    Every day?

17   A    No.

18   Q    Well, whenever patients came, that's where you saw them

19   a lot of the time?

20   A    Yes.

21   Q    Now, do you recall telling the agent that you met with

22   at the Friendly's in Gloucester that -- well, let me ask you

23   this.

24           You remember he showed you some reports with your

25   signature on it?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A    Yes.

2    Q    And do you remember if he asked you about those?

3    A    Yes.

4    Q    Do you remember what you told him?

5    A    I told him they looked like my signature.

6    Q    Do you remember telling that agent that you could not

7    recall why you signed it?  Do you remember that?

8    A    Yes.

9    Q    But that's not what you told us yesterday, is it?

10   A    Yes.

11   Q    Yesterday you told us that you knew that you were doing

12   something wrong, that you remembered signing it, correct?

13   A    Correct.

14   Q    But when you first talked to the agent, you told him you

15   didn't remember signing it, correct?

16   A    Correct.

17   Q    That was a lie?

18   A    Those --

19   Q    Well, was it true?

20   A    No.

21   Q    It was a lie?

22   A    Yes.

23   Q    So the first time that you met with the agents in this

24   case back in August of 2002, you lied to them, right?

25   A    No, I told them -- the ones they showed me I wasn't sure

1    as to the source of them, where they came from, and then

2    once I thought about it, then I recalled.

3    Q    You agree that you told them that you didn't know why

4    you signed it, right?

5    A    I agreed that I signed it.  I told them I didn't know

6    why I signed.

7    Q    And you agree that that was not true?

8    A    At the time I agreed that I had signed them, but I

9    wasn't really sure as to how to clarify as to why I singed

10   them.

11   Q    Well, has it gotten more clear since then, because

12   yesterday you told us you knew why you signed them, didn't

13   you?

14   A    Yes.

15   Q    You agree that August of 2002 was a lot closer in time

16   to the time that you allegedly signed these reports, right?

17   A    Correct.

18   Q    And it's fair to say that your memory was probably

19   better then than it was yesterday?

20   A    Correct.

21   Q    And so when you told the government agent that you

22   didn't know why you signed these reports, that simply wasn't

23   true, was it?

24   A    (No response.)

25   Q    It just wasn't true?

```
 1    A   At the time when they asked me if I signed them, I told
 2    them -- they didn't ask me --
 3    Q   Dr. Montoni --
 4                MR. WEINREB:  Objection, your Honor.  He takes
 5    a while --
 6                THE COURT:  Let him finish his answer.
 7    A   Let me clarify.
 8          When I signed those back in '99, at the time I was
 9    sick and extremely tired at that time.  I didn't sign them
10    for money or any reason of that.  I signed them because I
11    felt intimidated to --
12                MR. JONATHAN SHAPIRO:  I object and ask that
13    that be stricken.
14                THE COURT:  Yes.
15                THE WITNESS:  I --
16                THE COURT:  No, no, Doctor.  There is no
17    question before you now.
18          Answer the question, and once you've answered the
19    question, he'll ask you another question.
20                THE WITNESS:  Okay.
21          Sorry.
22    BY MR. JONATHAN SHAPIRO
23    Q   You agree that yesterday you told us that you remembered
24    signing them, right?
25    A   Yes.
```

1    Q    You told us that when you signed them you knew it was

2    wrong, right?

3    A    Yes.

4    Q    And you told us yesterday that the reason that you

5    signed them -- you gave us a reason, right?  You said that

6    you didn't want to have a confrontation with Mr. Yelaun,

7    right?

8    A    Correct.

9    Q    But when the government agent asked you the same

10   question back in August of 2002, your answer was, "I don't

11   recall signing them."  Isn't that what you said?

12         Isn't that what you said?

13   A    Yes.

14   Q    Now, the reason that you said that then was you thought

15   that it would be better if you just said you didn't remember

16   than to admit that you did it; isn't that right?

17   A    No.

18   Q    But, in any case, you admit that what you told the

19   agents then was not the truth in comparison to what you're

20   saying today?

21   A    Yes.

22   Q    Now, do you recall also telling the agents at some point

23   that the reason that you signed the reports was that you

24   believed that -- or that the people you talked to got you to

25   sign the reports by telling you that the reports were of

1    your patients, and the reports and prescriptions needed to

2    be signed by a doctor.

3              Do you remember that?

4    A    Yes.

5    Q    That was the reason you gave the agents back in August

6    or whenever as to why you signed them, right?

7    A    Right.

8    Q    But now you come forward with a completely different

9    reason as to why you signed them, right?  Isn't that right?

10   Your reason today as to why you signed them is because you

11   didn't want to have a confrontation with Mr. Yelaun?  Isn't

12   that what you told us?

13   A    He is the one who told me they were my patients and that

14   they needed to be signed.

15   Q    But when you first talked to the government agents, you

16   didn't say that you signed the reports because you didn't

17   want to have a confrontation with Mr. Yelaun, did you?

18   A    Correct.

19   Q    You told them that you signed the reports because

20   somebody told you that the reports were of your patients and

21   that they needed a signature, correct?

22   A    Correct.

23   Q    And you told the agent that back in 2002 because you

24   thought that that would sound better for you than if you

25   admitted having committed a fraud, correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    No.

2    Q    You didn't admit to those agents that you had committed

3    a fraud, did you?

4    A    No.

5    Q    Do you remember also telling the agents that when you

6    had this conversation that you say took place and you were

7    told that these were your patient files, do you recall

8    telling the agents that you didn't even look at the files?

9    A    Yes.

10    Q    Was that the truth?

11    A    Yes.

12    Q    Do you recall telling another agent on another date

13    that, in fact, you did look at the files?

14    A    The files for the prescriptions.

15    Q    Well, the files -- you told us, did you not, that files

16    were brought to your office in Swampscott?

17    A    Correct.

18    Q    And you were asked to sign prescriptions?

19    A    Correct.

20    Q    And isn't it true that back in August of 2002 you told

21    the agents that you didn't look at the file when they

22    presented -- when you were presented with the file. You

23    didn't look to see who the patients were even. You just

24    signed the prescription?

25    A    They must have put that down wrong, because I did.

PDF created with pdfFactory trial version www.pdffactory.com

```
1    Q   Do you recall telling them that you did not look at the

2    patient file to determine whether or not you had seen the

3    patient in question?

4    A   Yes.

5    Q   So you did tell them back then that you didn't even look

6    in the file to determine whether you had seen the patient in

7    question?

8    A   I looked at the file, the patient's file, as far as

9    their history and their exam.

10   Q   Well, if you looked at the patient's file to determine

11   their history and their exam, then you would have known if

12   it was your patient or not, wouldn't you?

13   A   Not necessarily.  The office there, physical therapy

14   office, had separate files from my files.

15   Q   Well, if you looked at the patient's exam in the file,

16   that would have indicated who did it --

17   A   Correct.

18   Q   -- wouldn't it?

19          So if you had looked at the file you would have

20   been able to determine whether it was your patient or not

21   because you would have seen the report that you had

22   prepared; correct?

23   A   My reports weren't in those files.

24   Q   Well, you say you looked at the report to determine the

25   patient's history and exam, right?
```

1    A    Correct.

2    Q    If it were your patient, you would have done the history

3    and exam, wouldn't you?

4    A    In many of those cases, there were other doctors that

5    did the histories and exams.

6    Q    Now, you told us yesterday that Mr. Yelaun, "Severin"

7    you called him, and Igor Moyseyev came to your office in

8    Swampscott?

9    A    Correct.

10   Q    And you claim that they asked you to sign prescriptions?

11   A    Correct.

12   Q    Is that what you told the agents when they first

13   questioned you?

14   A    No.

15   Q    You told them something else, didn't you?

16   A    I don't know if they asked about the prescriptions.

17   Q    Is it your testimony that when you met with Special

18   Agent Barbee in August of 2002 he didn't ask about the

19   signing of prescriptions, or you didn't tell him about

20   signing prescriptions?

21   A    I don't know if he asked about those ones specifically.

22   Q    Well, let me ask you this.

23        Do you recall telling the agent on August 1st of

24   2002 that it was Severin and a person by the name of Paul

25   Musaelyants who came to your office in Swampscott?

PDF created with pdfFactory trial version www.pdffactory.com

1     A    That's incorrect.

2     Q    Do you recall saying that you signed the reports and

3     prepared the prescriptions at the request of Severin Yelaun

4     and Paul Musaelyants?

5     A    I signed the reports at the request --

6     Q    The question was do you recall telling the agents on

7     August 1 of 2002 that you signed the reports and prepared

8     the prescriptions at the request of Severin Yelaun and Paul

9     Musaelyants?

10    A    That's incorrect.

11                    MR. JONATHAN SHAPIRO:  May I approach the

12    witness?

13                    THE COURT:  Yes.

14    Q    May I ask you to read this last paragraph on this page

15    to yourself?

16    A    Okay.

17         (Witness reads document.)

18    Q    Do you see that?

19         And I'm going to ask you again.  Isn't it true that

20    when you met with the agents on August 1 of 2002 you told

21    them that it was Mr. Yelaun and Mr. Musaelyants who asked

22    you to sign the reports and prepare the prescriptions?

23    A    That should say, "to sign the reports."

24    Q    But apparently you told them that it was Paul

25    Musaelyants and Mr. Yelaun who asked you to sign

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    prescriptions too, correct?

 2    A    That's incorrect.

 3    Q    So you're denying that you told this to the agent?

 4    A    I told him that --

 5    Q    Are you denying --

 6                    MR. WEINREB:  Objection.

 7    Q    Are you denying that this was what you told the agent?

 8                    THE COURT:  Let him answer the question.

 9    A    It's incorrect, so --

10    Q    You agree, do you not, that there is nothing in this

11    report about Igor Moyseyev and Severin Yelaun asking you to

12    sign prescriptions, is there?

13    A    Correct.

14    Q    So the only thing that this report says about your being

15    asked to sign prescriptions mentions a Paul Musaelyants and

16    Severin Yelaun, correct?

17    A    Yes.

18    Q    But when you testified yesterday, you claim that an

19    Igor Moyseyev was there and not Musaelyants?

20                    MR. WEINREB:  Objection.  That's a misleading

21    question.

22                    THE COURT:  Sustained.

23    Q    Well, did you tell us that it was Mr. Moyseyev and

24    Mr. Yelaun?

25                    MR. WEINREB:  The objection is he's not
```

PDF created with pdfFactory trial version www.pdffactory.com

1    specifying what he's referring to.

2            THE COURT:  It's an unclear question.

3    Q    When you testified yesterday, you testified that Igor

4    Moyseyev and Severin Yelaun came to your office in

5    Swampscott and asked you to sign prescriptions?

6    A    That's true.

7    Q    But you agree that there is nothing in your report of

8    August 1 of 2002 where you say that Igor Moyseyev and

9    Severin Yelaun came to your office in Swampscott?

10   A    Yes.

11   Q    You agree?

12   A    I agree.

13   Q    You testified yesterday, did you not, that you, in fact,

14   had signed about two dozen EMG/NCV prescriptions for

15   patients?

16   A    Correct.

17   Q    And these -- so you did sign prescriptions over the

18   course of some months for as many as two dozen patients who

19   you had determined legitimately needed EMGs and NCVs,

20   correct?

21   A    Yes.

22   Q    And you determined that these patients -- or that an EMG

23   and an NCV was medically necessary for these patients?

24   A    Yes.

25   Q    And that's why you wrote the prescriptions?

1    A    Yes.

2    Q    And, in fact, you know that over the course of the time

3    you worked at Broadway Physical Therapy Center and at Lynn

4    Diagnostics, EMG and NCV tests were regularly performed at

5    those locations?

6    A    Yes.

7    Q    You knew that a Dr. Shah performed the EMG and the NCV

8    test, correct?

9    A    Yes.

10    Q    And you knew that Dr. Chatterjee regularly performed EMG

11    and NCV tests at those locations?

12    A    Yes.

13    Q    And you were aware of the fact that a person by the name

14    of Yuri, a Russian by the name of Yuri, came to those

15    locations with EMG equipment?

16    A    Yes.

17    Q    And your understanding was that he was giving EMG and

18    NCV tests?

19    A    Yes.

20    Q    And I think you also indicated that a Dr. Kinnard, you

21    were aware, performed EMG and NCV tests at those locations?

22    A    Yes.

23    Q    And I think that the fact -- in fact, you had indicated

24    that that Dr. Shah performed EMG tests two times a week at

25    these locations?

1    A    I would think so.

2    Q    Excuse me?

3    A    Yes.

4    Q    And, in fact, you told the IRS agent on August 2 of

5    this year that you saw Dr. Shah doing EMGs two times a week

6    at the Broadway Physical Therapy Clinic?

7    A    I definitely saw him doing it.  I am not sure about the

8    twice a week.

9    Q    But whatever --

10   A    But with some frequency.

11   Q    Okay.

12        And you also knew that a person by the name of Mike

13   came to the clinics with EMG equipment and performed EMG and

14   NCV tests?

15   A    Yes.

16   Q    So we have Mike.  We have Yuri.  We have Dr. Kinnard.

17   We Dr. Shah.  We have Dr. Chatterjee.  And you were aware

18   they all performed EMG and NCV tests at Broadway Physical

19   Therapy and Lynn Diagnostics over the period of time that

20   you were involved in those clinics?

21   A    Yes.

22   Q    Now, you also testified yesterday you have an

23   explanation of why you signed the prescriptions when

24   Moyseyev, you say, and Mr. Yelaun, you say, came to your

25   office in Swampscott, correct?

1  A    Correct.

2  Q    And your explanation now is that basically Mr. Yelaun

3  had yelled at you and pounded his fist on the table some

4  time ago and you didn't want to have another confrontation;

5  is that right?

6  A    Correct.

7  Q    And the time that you told us that he had yelled at you

8  was in connection with him wanting you to sign a lease for

9  x-ray equipment.  Do you remember that?

10  A    Correct.

11  Q    That's when this confrontation allegedly took place?

12  A    Yes.

13  Q    But that's not what you told the government agents when

14  they first talked to you, is it?  You had a different

15  explanation then, didn't you?

16  A    I believe they asked me if Severin had ever threatened

17  me.

18  Q    Isn't it true that when you were first asked, and I

19  think you had told us about this already, when you were

20  first asked why you signed the prescriptions, you said that

21  you didn't even recall signing the prescriptions.

22        Do you remember that?

23  A    I think that's -- they were talking about the report.

24  Q    Well, now, do you recall that the -- I guess it was

25  Agent Johnson, David Johnson.

PDF created with pdfFactory trial version www.pdffactory.com

1           Do you remember Special Agent David Johnson?

2   A    No.

3   Q    Do you recall having an interview with a Special Agent

4   of the FBI on October 22 of 2002?

5   A    Was -- no, I don't recall.

6   Q    Do you recall being asked about -- let me ask you this.

7           You recall one meeting at Friendly's --

8   A    Yes.

9   Q    -- in August of 2002?

10  A    Correct.

11  Q    Do you recall a second meeting in the government offices

12  here on October 22 of 2002 or October 21 of 2002?

13  A    Correct, yes.

14  Q    And this was a meeting at which your attorney was

15  present?

16  A    Yes.

17  Q    And do you recall at that time being shown some reports

18  of EMG/NCV tests --

19  A    Yes.

20  Q    -- with your signature?

21  A    Yes.

22  Q    Do you recall telling the government special agent, as

23  well as a couple of the government attorneys, that you could

24  not account for why these signatures were on the reports?

25  Do you recall that?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A   Yes.

 2   Q   Now, that wasn't true, was it?

 3   A   No.

 4   Q   That was a lie too, wasn't it?

 5   A   Yes.

 6   Q   Because now you claim that you could -- you did know why

 7   your signature was on the reports, right?

 8   A   At that time I didn't clarify.

 9   Q   Well, not only did you not clarify it, but you told the

10   government agent and the government lawyers something that

11   wasn't true, didn't you?

12   A   No.

13   Q   You didn't tell them something that wasn't true?

14   A   No.

15   Q   Well, was it true at that time that you could not

16   account for why your signature was on those reports?

17   A   Yes.

18   Q   That was true?

19   A   At that time I couldn't fully account for it.

20   Q   Dr. Montoni, are you just coming up with another

21   explanation for why you told a lie back then?

22   A   No.

23   Q   Did you tell us the first time when you told the

24   government agents something that wasn't true it was because

25   you were sick and because you were tired?  Is that your
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    explanation now for why you told that lie?
 2    A    I told them that I had signed it, but I wasn't clear as
 3    to why I signed it.
 4    Q    And that wasn't true, was it?
 5    A    I believe it was true at the time.
 6    Q    And you believe it was true at the time because you were
 7    tired and because you were sick?
 8    A    In part.
 9    Q    And now that you've had a chance to think about it, now
10    you remember the real truth; is that what you're telling us?
11    Back then you didn't remember the real truth, and now you
12    do, three years later or four years later?
13    A    No.
14    Q    Well, do you remember telling us yesterday about the
15    confrontation, the argument, Mr. Yelaun yelling at you, and
16    as a result you didn't want to have any more confrontations
17    with him because he wanted you to sign a lease for x-ray
18    equipment, correct?
19    A    Correct.
20    Q    Well, do you remember that when you first talked to the
21    agents about the x-ray equipment, you told the agents that
22    it was Mr. Moyseyev who asked you to sign the lease?
23    A    It was both Mr. Moyseyev and Mr. Yelaun at the same
24    meeting.
25    Q    My question is do you recall telling the agents that it
```

PDF created with pdfFactory trial version www.pdffactory.com

1    was only Mr. Moyseyev who asked you to sign the lease?

2    A    That's incorrect.

3    Q    Let me ask you, do you recall meeting with Special Agent

4    Jessica Crooker of the Internal Revenue Service on February

5    9 of 2005?

6    A    Yes.

7    Q    And in addition your attorney was present?

8    A    Yes.

9    Q    Do you recall telling this assembled multitude that

10   Moyseyev wanted Montoni to sign the lease for the x-ray

11   equipment.  Montoni agreed to sign the lease after Moyseyev

12   agreed to guarantee payment.

13          Do you recall telling them that?

14   A    Yes.  That's true.

15   Q    So at that time, that is, in February of 2005, you

16   didn't say that Mr. Moyseyev and Mr. Yelaun asked you to

17   sign the x-ray [sic], did you?  Did you?

18   A    Severin didn't agree --

19   Q    No, no.

20          The question was, did you tell the agents and the

21   government attorneys that both Mr. Yelaun and Mr. Moyseyev

22   asked you to signed the equipment lease?

23   A    They both didn't agree to guarantee it.

24   Q    Yes.

25          But you agree that you told them that Moyseyev

PDF created with pdfFactory trial version www.pdffactory.com

1    wanted you to sign the lease for the x-ray equipment?

2    A    That's true.

3    Q    You didn't say Mr. Yelaun wanted you to sign the lease,

4    did you?

5    A    Not according to that.

6    Q    Well, are you denying that that's what you told them?

7    A    No.  That part's correct.

8    Q    Did you tell them that Mr. Yelaun yelled at you and

9    banged his fist on the table?

10    A    I don't know if I did in that interview.

11            MR. JONATHAN SHAPIRO:  May I approach the

12    witness?

13            THE COURT:  Yes.

14    Q    Just look as paragraph 6 and read it to yourself.

15    A    Yes.

16    Q    That's the only thing in this report about leasing the

17    x-ray equipment, isn't it?

18    A    As far as I know, yes.

19    Q    And there is nothing in here about Mr. Yelaun at all, is

20    there, and the x-ray equipment, leasing it?

21    A    Correct.

22    Q    And there's nothing in here about your feeling pressured

23    into signing the lease, is there?

24    A    No.

25    Q    In fact, you say that you signed the lease willingly

PDF created with pdfFactory trial version www.pdffactory.com

1    because Mr. Moyseyev agreed to guarantee the payment?

2    A    After he agreed, yes.

3    Q    And so --

4    A    But that isn't --

5    Q    Just answer the question.

6            At least as far as signing the x-ray -- the lease

7    for the x-ray, so long as Moyseyev was guaranteeing it, you

8    didn't have to worry, did you?

9    A    That was after Severin was yelling and ranting and

10   raving about the lease.  Igor agreed to guarantee the lease,

11   because I said to Severin, I don't know who you are.  He

12   became furious and started yelling, and then Igor agreed to

13   guarantee the lease.

14   Q    When did you think this story up?

15   A    It's true.

16   Q    Well, you didn't tell the government agents and lawyers

17   about it in February of 2005, did you?

18   A    That doesn't make it not true.

19   Q    You didn't tell them about it, did you?

20   A    No.

21   Q    You were supposed to tell them the truth at the time,

22   weren't you?

23   A    They may not have asked it that way.

24   Q    Well, they apparently asked you why you signed the lease

25   for the x-ray equipment, correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    Apparently, yes.

2    Q    And you told them you signed the lease because Moyseyev

3    wanted you to sign the lease and he agreed to guarantee the

4    payment?

5    A    Yes.

6    Q    Now, it's true, is it not, that the EMG/NCV reports that

7    you say you signed were reports that had been generated by

8    an EMG/NCV machine or equipment?

9    A    Apparently, yes.

10    Q    And you believed that those reports were genuine, didn't

11    you?

12    A    Yes.

13    Q    And you thought they had been performed by either

14    Dr. Kinnard, Dr. Shah, Dr. Chatterjee, Yuri or mike?

15    A    Yes.

16    Q    And you had seen -- you saw the reports and you were

17    familiar with the kind of report that was generated by a

18    EMG/NCV machine, correct?

19    A    Correct.

20    Q    Now, yesterday you told us that Mr. Yelaun was the one

21    who asked you to sign these NCV reports at the clinic,

22    correct?

23    A    Correct.

24    Q    Do you recall telling the government agents in February

25    of 2005 that in 1999 you were approached by Mr. Yelaun,

```
 1    Mr. Moyseyev and Paul Musaelyants, and you were asked to

 2    sign NCV and EMG report -- or EMG reports?

 3              Do you recall that?

 4    A    Can you state that one more time?

 5    Q    Yes.

 6              My question is do you recall telling the government

 7    agents and lawyers in February of 2005 that it was

 8    Mr. Moyseyev, Mr. Musaelyants and Mr. Yelaun who came and

 9    asked you to sign EMG reports?

10    A    It wasn't Igor Moyseyev.

11              It was Paul Musaelyants and Severin Yelaun.

12    Q    Yesterday you told us that only Mr. Yelaun was the one

13    who asked you to sign reports, correct?

14    A    Did I use the term "only"?

15    Q    Well, when you were asked who came to you and asked you

16    to sign the report, you said it was Mr. Yelaun, right?

17    A    Correct.

18    Q    You didn't mention Mr. Moyseyev, did you?

19    A    He wasn't there.

20    Q    You didn't mention Mr. Musaelyants, did you?

21    A    He was there.

22    Q    You didn't mention him when you testified yesterday, did

23    you?

24    A    No.

25    Q    And isn't it true that back in February of 2005 you said
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    it was Mr. Moyseyev and Mr. Musaelyants, too?

 2    A    That's incorrect.

 3                  MR. JONATHAN SHAPIRO:  May I approach the

 4    witness?

 5                  THE COURT:  Yes.

 6    Q    Would you look and read to yourself paragraph 33.

 7    A    (Witness complies.)

 8    Q    Did you read it to yourself?

 9    A    Yes.

10    Q    Now I'm going to ask you, isn't it true that you told

11    the government agents and lawyers back in February of 2005

12    that Moyseyev, Musaelyants, and Yelaun all approached you

13    and asked you to sign these reports?

14    A    That's incorrect.

15    Q    So you deny that you said that?

16    A    I deny it.

17    Q    They got it wrong?

18    A    I believe so.

19    Q    And it's true, is it not, that it wasn't -- that

20    Mr. Yelaun didn't ask you to sign all those reports, did he?

21    A    Ask that again.

22    Q    Isn't it true that Musaelyants asked you to sign reports

23    and Mr. Yelaun wasn't even there?

24    A    They were both together.

25    Q    Is it your testimony each time you were asked to sign
```

1    reports Mr. Yelaun and Mr. Musaelyants came together?  Is

2    that your testimony?

3    A   I am just trying to think if it was 100 percent of the

4    time.  They were usually together.  I can't say it was 100

5    percent of the time.

6    Q   Isn't it true that back in August of this year you had

7    another meeting with Jessica Crooker, Special Agent of the

8    Internal Revenue Service, and Mr. Weinreb, Mr. Greg Shapiro,

9    and another Assistant US Attorney and your attorney --

10   A   Yes.

11   Q   -- in which you discussed your testimony?

12   A   Yes.

13   Q   And do you remember at that time telling them all that

14   it was either Musaelyants or Yelaun who had asked you to

15   sign reports?

16   A   That's why I'm saying I'm not sure it was 100 percent of

17   the time.  They, in general, the majority of the time, were

18   together, and one or the other would ask.

19   Q   You don't even remember, do you, who came to you on any

20   particular occasion and asked you about reports, do you?

21   A   I do.

22   Q   Well, do you recall dates?

23   A   No.

24   Q   Do you remember names of patients?

25   A   No.

1  Q    Did you make any record?

2  A    No.

3  Q    And you can't tell us even how many times you were asked

4  to sign a report, can you?

5  A    No.

6  Q    But you do agree that you told the government attorneys

7  and agents that it was either one or the other who came?

8  A    Yes.

9  Q    And you're not sure who came at any particular time?

10  A    Not the specific dates, no.

11  Q    And, in fact, you're not even -- you can't even say that

12  it wasn't Musaelyants who asked you to do it all of the

13  time?

14  A    I can say that for sure.

15  Q    Now, you told us that you had a tragedy in your family

16  back Mr. 1995 which left you depressed?

17  A    Correct.

18  Q    And that you were -- you sought treatment?

19  A    Yes.

20  Q    And you were prescribed medication for a certain period

21  of time?

22  A    Yes.

23  Q    You say you took Zoloft for a month?

24  A    Yes.

25  Q    But since that time you haven't taken any medication?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    A    In 1999 I went and saw Dr. Cootcherall [ph.] down in
 2    Scituate for a chronic pneumonia infection, and he
 3    prescribed Levaquin, which had a -- appeared to have and
 4    adverse effect on me.  I was quite tired after that.
 5    Q    Levaquin is an antibiotic?
 6    A    Correct.
 7    Q    Other than the medication that you say you were
 8    prescribed back in 1995 for depression, have you taken any
 9    other medication for depression since that time?
10    A    No.
11    Q    Have you taken -- I think you were asked whether you
12    self-medicated?
13    A    No.
14    Q    And so -- but you say your depression continued?
15    A    Yes.
16    Q    But you didn't take any medication?
17    A    Correct.
18    Q    Do you recall being asked when you met with the
19    government agents on August of 2006, that is, the
20    government's agents, your attorney and the government's
21    attorney, do you recall saying that -- blaming a lot of your
22    problems on the fact that the medication that you were
23    taking had an adverse -- that is, the depression medication
24    that you were taking had an adverse effect?
25    A    No.  I already said the Levaquin, and they might have
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    misinterpreted it, because I wasn't taking --
 2    Q    Do you recall telling the government agents that you
 3    were able to walk away from -- walk away from work in 2001
 4    because your depression had lifted?  Do you recall that?
 5    A    2001?
 6    Q    Do you remember that, saying that your depression had
 7    lifted in 2001?
 8    A    Yes.
 9    Q    And do you recall saying that your depression was caused
10    by medication that you were taking?  Do you remember that?
11    A    I might have said it was worsened by it.
12              MR. JONATHAN SHAPIRO:  May I approach the
13    witness?
14              THE COURT:  Yes.
15    Q    Just read paragraph 9 to yourself and go over to the
16    next page, okay?
17    A    (Witness complies.)
18         Can you rephrase your question?
19    Q    My question is, didn't you tell the government agents
20    and attorneys that your depression was caused by medication
21    that you were taking?
22    A    That isn't the same question you just asked me.
23         What was the question?
24    Q    The question is didn't you tell the government agents
25    and attorneys that your depression was caused by medication
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    that you were taking?

 2    A    That's not correct.

 3    Q    Let me show that to you again.

 4          Just read paragraph 9 to yourself, and particularly

 5    the last sentence of paragraph 9.

 6    A    (Witness reads document.)

 7          This says the depression was caused by medication.

 8    That's not right.

 9    Q    So you deny that you told the government agents that the

10    depression was caused by medication you were taking?

11    A    I might have said it was made worse.

12    Q    But you say you weren't taking any medication?

13    A    I just told you I was taking the Levaquin, which can

14    cause psychotic or depressive changes.

15    Q    But you agree that at least according to the report it

16    said that you were -- your depression was caused by

17    medication you were taking?

18    A    Levaquin can cause depression.  If the person's already

19    depressed, it makes it much worse.

20    Q    Is it your testimony that your depression was caused by

21    Levaquin?

22    A    I believe it was made worse by the Levaquin.

23          I took that in 1991 -- I mean 1999 and 2001.

24    Q    Now, you remember yesterday that you told us that you

25    were paying for the lease of the x-ray equipment?
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    A    Yes.

2    Q    Do you recall telling -- isn't it true that Mr. Moyseyev

3    was paying for the lease of the equipment?

4    A    Initially, but then he reneged on it, stopped paying.

5    Q    You didn't tell us that yesterday, did you?

6    A    No.

7    Q    Now, you also indicated that when you first became

8    associated with the Broadway Physical Therapy Clinic, you

9    had some -- you had no formal arrangement with Mr. Yelaun or

10   Mr. Moyseyev, correct?

11   A    Correct.

12   Q    You said you billed for your services and you collected

13   from the insurance company?

14   A    Yes.

15   Q    And you didn't pay anything to Mr. Yelaun or

16   Mr. Moyseyev?

17   A    Correct.

18   Q    Do you recall telling the government agents that, in

19   fact -- that you paid for rent of that space?

20   A    On Broadway?

21   Q    Yes.  Do you recall that?

22   A    No.

23              MR. JONATHAN SHAPIRO:  May I approach the

24   witness?

25              THE COURT:  Yes.
```

```
1    Q    This is August 2, 2006.  Let me ask you to look at
2    paragraph 8.
3              Read it to yourself.
4    A    (Witness complies.)
5    Q    Do you see that?
6    A    Correct.
7    Q    So you told the government attorneys that, in fact, you
8    did pay rent; is that right?
9    A    At Igor's place I paid rent.
10   Q    Well, The only financial relationship Montoni had with
11   Yelaun and Moyseyev was the rent he paid for the use of his
12   space there, correct?
13   A    That's what I said.
14   Q    But that's not what you told us yesterday?
15   A    Correct.
16   Q    It's true, is it not, Dr. Montoni, that your
17   recollection, whether it was because of depression,
18   medication, or other things going back to 1999 and 2000, is
19   pretty bad, isn't it?
20   A    I believe my memory is affected, but I believe the
21   events were true that --
22   Q    So you think generally true, but you agree that there
23   are lots of inconsistencies in what you remember now and
24   what you told people in the past, correct?
25   A    Yes.
```

```
 1    Q    And you blame that, to a certain extent, on your

 2    condition back then, correct?

 3    A    Correct.

 4    Q    You say you were sick?

 5    A    Yes.

 6    Q    You say you were depressed?

 7    A    Yes.

 8    Q    In fact, you say you were suicidal, don't you?

 9    A    Yes.

10    Q    So that whole period of time is a period of time that's

11    not particularly clear to you?

12    A    Correct.

13                   MR. JONATHAN SHAPIRO:  I have no further

14    questions.

15                   THE COURT:  Any redirect examination?

16                   MR. WEINREB:  Yes.

17                      REDIRECT EXAMINATION

18    BY MR. WEINREB

19    Q    Dr. Montoni, you were asked on cross-examination about

20    the charge that you have pled guilty to.

21          Do you recall that?

22    A    Yes.

23    Q    And you were asked whether it said that you plead guilty

24    to a conspiracy to commit health care fraud or mail fraud,

25    wire fraud and health care fraud with Igor Moyseyev and
```

1   David Tamaren, correct?

2   A   Yes.

3   Q   And you said no.

4         The indictment, in fact, charges you not just with

5   conspiracy to commit health care fraud with Igor Moyseyev

6   David Tamaren and John Montoni, but with Severin Yelaun as

7   well, correct?

8   A   Correct.

9   Q   So that's what you admitted to, conspiracy with all

10  three of those individuals?

11  A   Yes.

12  Q   Now, that's not something you just admitted to when you

13  pled guilty a month or two ago, is it?

14  A   Correct.

15  Q   You were asked numerous questions about what you said to

16  the agents when you they interviewed you in August of 2002,

17  correct?

18  A   Yes.

19  Q   That was four years ago or more -- four and a half years

20  ago?

21  A   Yes.

22  Q   Was that the first time they interviewed you?

23  A   Yes.

24  Q   And the agents came to you with a report, an EMG report,

25  with your signature on it?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    Yes.

2   Q    Did they have one or more than one?

3   A    It was only a couple.

4   Q    They had a couple and they confronted you with that,

5   correct?

6   A    Yes, they did.

7   Q    Now, at the time they were interviewing you at a

8   restaurant?

9   A    Friendly's, yes.

10  Q    And I believe you testified you didn't have a lawyer

11  present?

12  A    Correct.

13  Q    And there was no government attorney present?

14  A    Correct.

15  Q    It was just police officers questioning you about a

16  possible crime?

17  A    Yes.

18  Q    They didn't offer you any deal, did they?

19  A    No.

20  Q    They didn't promise you anything in exchange for what

21  you told them?

22  A    No.

23  Q    They just asked you what happened?

24  A    Yes.

25  Q    Did you tell them the truth?

1    A    Yes.

2    Q    And at that time, on August 1, 2002, did you say you

3    recalled signing EMG reports for tests you never conducted?

4    A    Yes.

5    Q    Do you recall saying that you signed the reports at the

6    request of Severin Yelaun and Paul Musaelyants?

7    A    Yes.

8    Q    That was back in August 2002?

9    A    Yes.

10   Q    Not long after you actually did these things?

11   A    Correct.

12   Q    So that wasn't something that you said for the first

13   time when somebody offered you a deal?

14   A    That's true.

15   Q    That wasn't something that you just said once you heard

16   about the term -- had you ever heard about the term

17   "substantial assistance" at the time?

18   A    No.

19   Q    Were you even thinking about some future case and

20   pleading guilty and cooperation?

21   A    No.

22   Q    You told them at that time you never received money or

23   any other benefit for signing the documents?

24   A    True.

25   Q    Is that true?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    It is true.

2    Q    But you admitted they were fraudulent?

3    A    Yes.

4    Q    You said at that time that you could not recall why you

5    had signed the fraudulent documents; isn't that right?

6    A    Yes.

7    Q    You said you were sick in the late 1990s and that may

8    have had something to do with it?

9    A    Correct.

10    Q    That's what you testified to on the stand, correct?

11    A    Yes.

12    Q    Now, have you thought a lot since then about why you

13    committed this fraud?

14    A    Yes, very much.

15    Q    At the time you were questioned in August of 2002, you

16    knew you had committed a fraud?

17    A    Yes.

18    Q    That wasn't something you realized over time?

19    A    Yes.

20    Q    Have you had to do some soul searching as to why you did

21    it?

22    A    Correct.

23    Q    You thought about all the reasons why?

24    A    Yes.

25    Q    And you testified that one of them was that you were

PDF created with pdfFactory trial version www.pdffactory.com

1    sick and that may have had something to do with it?

2    A    Yes.

3    Q    You testified that one event was that you did not want a

4    confrontation with Mr. Yelaun?

5    A    Correct.

6    Q    Are you a person who likes to have confrontations?

7    A    No.

8    Q    Would you say in your life in general that is something

9    that you have sought out or avoided?

10   A    For some reason I always avoid it.

11   Q    At the conclusion of the interview on August 21, you

12   admitted once more to signing diagnostic testing reports

13   that you did not perform, and that you were asked by Yelaun

14   and Musaelyants to complete these tasks; is that right?

15   A    Yes.

16   Q    That was your memory back then right after it happened?

17   A    Yes.

18   Q    And that's your memory today?

19   A    Yes.

20   Q    Mr. Shapiro asked you early on in your testimony, he

21   said that you -- he asked, isn't it true that you made

22   numerous false statements and lies?

23   A    Correct.

24   Q    And you said, you had, right?

25          What were you referring to when you said you had

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    and you were agreeing to that?

 2    A    Mostly that I hadn't told the full truth.

 3              In other words, when they asked why I had signed

 4    them, I kind of wasn't sure.  I knew that I had done it, and

 5    I knew who had asked me to do it.  The problem was the

 6    mechanics of it as to why.  So it's --

 7    Q    Is that something you're still asking yourself today,

 8    why you did this crime?

 9    A    Yes.

10    Q    You were asked -- you said that you prepared for your

11    testimony last Friday?

12    A    Yes.

13    Q    You said that lasted about an hour?

14    A    Yes.

15    Q    You met with me, in fact; isn't that right?

16    A    True.

17    Q    And I asked you the same questions, more or less, that I

18    asked you in court; is that right?

19    A    Yes.

20    Q    And you answered them?

21    A    Yes.

22    Q    Did I tell you to give any particular answer?

23    A    No.

24    Q    Did anyone tell you to give any particular answer?

25    A    No.
```

1  Q    Did anyone tell you to change any of your answers and
2  say that any of your answers were good or bad ones?
3  A    No.
4  Q    What were you told was expected of you?
5  A    Only to tell the truth.
6  Q    Were you told that anything else whatsoever was expected
7  of you?
8  A    No.
9  Q    Were you told that there would be consequences if you
10  did not tell the truth?
11  A    Yes.
12  Q    Were you told what the truth was?  Did I tell you what
13  you should say or shouldn't say?
14  A    Oh, no.
15  Q    Did I tell you that it didn't matter what the truth was,
16  whether it helped the government or hurt the government,
17  would you just say what it was?
18  A    Yes.
19  Q    Those very words?
20  A    Yes.
21  Q    Is it your understanding, as you sit here today, that
22  you have any obligation other than to tell the truth?
23  A    No.
24  Q    Were you told that "substantial assistance" consisted of
25  telling the truth and that it made absolutely no difference

PDF created with pdfFactory trial version www.pdffactory.com

```
1    whether the jury convicted Mr. Yelaun or not?

2    A    Correct.

3    Q    In other words, were you told it was not your job to be

4    helpful to the government, it was only your job to tell the

5    truth no matter who it helped?

6                    MR. JONATHAN SHAPIRO:   I'm going to object to

7    the leading.

8                    THE COURT:   Sustained.

9    Q    You testified you were asked questions about the

10   incident that you recalled where Mr. Yelaun and Mr. Moyseyev

11   came to your home in Swampscott?

12   A    Yes.

13   Q    And you were also asked about a home in Gloucester?

14   A    Yes.

15   Q    What did you use -- at the time that this occurred, when

16   Mr. Yelaun and Mr. Moyseyev came to your home in Swampscott,

17   what did you use the house in Gloucester for?

18   A    That's where we lived.

19   Q    Did you live there full time?

20   A    No.  At that time we had -- we were going back and forth

21   between the two houses, I believe.  But I don't want to say

22   it incorrectly.  You know, during that time there was a

23   transition where we were actually in between both houses.

24   Q    Which house did you own first?

25   A    The Swampscott house.
```

1    Q    So you lived there full time?

2    A    Yes.

3    Q    And at some point you acquired the Gloucester house?

4    A    Yes.

5    Q    Did you acquire it for a purpose?

6    A    Yes.

7         Eventually we were going to sell the Swampscott

8    house and move to Gloucester.

9    Q    When you first acquired it, was there a purpose for

10   having it, other than to eventually move there?  Were you

11   using it?  Were you living there or were you just visiting

12   there and spending some days there and not others?

13   A    Initially, we would just go up for short spells.

14   Q    Any particular times?  Weekdays, weekends, vacations?

15   A    No.  Just whenever we could.  Weekends that type.  Then

16   we would move up there sometimes for the summer, you know.

17   But we were back and forth between the two houses.

18   Q    So Swampscott, the Swampscott house, was that just an

19   office or was it a home?  Did you have bedrooms?

20   A    Oh, yes.  We lived there.

21   Q    Did your kids live there?

22   A    Yes.

23   Q    Did you live there?

24   A    Yes.

25   Q    Did your wife live there?

1    A    Yes.

2    Q    And did you all live there when Mr. Yelaun and

3    Mr. Moyseyev came out and knocked on your door?

4    A    Yes.

5    Q    You said you had a home office there, correct?

6    A    Yes.

7    Q    Had they ever been to your home office?

8    A    No.

9    Q    Had you ever invited them to your home office?

10   A    Yes.

11   Q    This was the very first time?

12   A    Yes.

13   Q    Did they make an appointment?

14   A    No.

15   Q    You testified that a number of doctors performed EMGs at

16   the Broadway Clinic, at Everett, and then later in Lynn; is

17   that correct?

18   A    Correct.

19   Q    Did you actually see all of those doctors performing EMG

20   tests at all those locations?

21   A    Just the office on Broadway.

22   Q    Who did you see there?

23   A    Dr. Shah.

24   Q    Anyone else?

25   A    No.

```
 1    Q    So did you ever see Dr. Chatterjee perform an EMG test
 2    there?
 3    A    No.
 4    Q    Have you ever even met Dr. Chatterjee?
 5    A    No.
 6    Q    Never seen him once?
 7    A    I might have seen him.
 8    Q    But you never actually met him?
 9    A    Not that I recall.
10    Q    So you don't know whether he did EMG tests there or
11    anywhere else?
12    A    No.  I don't know.
13    Q    Do you know whether Dr. Kinnard did EMG tests at the
14    Broadway Clinic?
15    A    I don't know if he did.  He had his own office.
16    Q    So you didn't see him doing them?
17    A    No.
18    Q    The only one you saw was Dr. Shah?
19    A    Correct.
20    Q    You were interviewed on February 9, 2005, correct?
21    A    Yes.
22    Q    And you were asked quite a number of questions about
23    that interview; do you recall?
24    A    Yes.
25    Q    One of them had to do with the x-ray equipment and who
```

PDF created with pdfFactory trial version www.pdffactory.com

1    asked you to pay for it?

2    A    Yes.

3    Q    Do you recall saying at that interview that you made

4    plans with Dr. Tamaren and Mr. Yelaun to set up x-ray

5    equipment at their Chelsea location?

6    A    Yes.  That was the initial meeting, yes.

7    Q    And that's what you testified to yesterday, right?

8    A    Yes.

9    Q    Is that true?

10   A    It is true.

11   Q    And then you said at that interview that Moyseyev wanted

12   you to sign the lease for the x-ray equipment; is that

13   right?

14   A    Yes.

15   Q    Was that true?

16   A    It is true.

17   Q    Did Mr. Yelaun also want you to sign it?

18   A    Yes.

19   Q    And then it says here, Moyseyev agreed to sign the

20   lease -- you agreed to sign the lease after Moyseyev agreed

21   to guarantee payment, correct?

22   A    Yes.

23   Q    That's also what you said yesterday, correct?

24   A    Yes.

25   Q    You said at that interview that it was Yelaun and Paul

PDF created with pdfFactory trial version www.pdffactory.com

1   Musaelyants who asked to sign completed EMG reports; is that

2   right?

3           That was the same thing you had said from the

4   start?

5   A   That's true.

6   Q   You were interviewed four years ago about these events;

7   is that right?  August 1st, 2002, that would have been

8   almost four and a half years ago?

9   A   Correct.

10  Q   And then again February 9, 2005, that was almost two

11  years ago; is that right?

12  A   Yes.

13  Q   And you were shown reports of those interviews, is that

14  right?

15  A   Yes.

16  Q   And in some cases the reports were written by one agent

17  and in some cases the reports were written by a different

18  agent; is that right?

19  A   Correct.

20  Q   And when you were at those interviews, those respective

21  agents were taking notes; is that right?

22  A   Yes.

23  Q   Afterwards did they show you the notes and ask you if

24  they had gotten everything exactly correctly?

25  A   No.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q   And when they typed up their reports, did they show you

2  the reports and ask you if everything on them was correct?

3  A   No.

4  Q   Before today had you ever seen those reports?

5  A   Yes, I think.

6  Q   Did your lawyer show them to you?

7  A   Yes.

8  Q   All right.

9       But the reports were never shown to you by any of

10 the agents?

11 A   No.

12 Q   And you were never asked to make corrections to them?

13 A   No.

14 Q   You were never asked whether they had understood you

15 correctly in everything that they wrote?

16 A   No.

17 Q   Or whether they had written it down exactly right?

18 A   No.

19 Q   Now, sometimes when you were talking to the agents, you

20 were talking about prescriptions?

21 A   Yes.

22 Q   And sometimes you were talking about a report?

23 A   Correct.

24 Q   Now, were there times when the people you were talking

25 to ever seemed confused about whether you were talking about

PDF created with pdfFactory trial version www.pdffactory.com

1    the prescriptions?

2                   MR. JONATHAN SHAPIRO:  Objection, leading.

3                   THE COURT:  Sustained.

4    Q   Did you ever have to clarify whether you were talking

5    about prescriptions versus reports?

6    A   Yes.

7    Q   More than once?

8    A   It was a cloudy issue.

9    Q   As you sit here today, are you 100 percent certain that

10   Severin Yelaun and Paul Musaelyants asked you to sign your

11   name on all of those EMG reports that they handed you?

12                  MR. JONATHAN SHAPIRO:  Objection.

13                  THE COURT:  Grounds?

14                  MR. JONATHAN SHAPIRO:  Leading.

15                  THE COURT:  Sustained.

16   Q   How sure are you that Severin Yelaun and Paul

17   Musaelyants asked you to sign those EMG reports, those phony

18   EMG reports?

19   A   100 percent.

20                  MR. WEINREB:  No further questions.

21                  THE COURT:  Recross?

22                      **RECROSS-EXAMINATION**

23   BY MR. JONATHAN SHAPIRO

24   Q   Dr. Montoni, you say that in the course of your

25   interviews with the agents you often had to clarify certain

PDF created with pdfFactory trial version www.pdffactory.com

1    issues?

2    A    Correct.

3    Q    And you say you did, correct?  You say you did clarify?

4    A    If they asked for clarification.

5         I wouldn't know if they needed clarification if

6    they didn't ask for it.

7    Q    Well, you told us that they needed clarification about

8    prescriptions and reports, correct?

9    A    At times, yes.

10    Q    And you clarified that?

11    A    As best I could, yes.

12    Q    And you've reviewed -- you told us that you reviewed

13    those reports, correct?

14    A    Yes.

15    Q    And since reviewing them, did you ever tell the

16    government that there was anything incorrect in those

17    reports?

18    A    No.

19    Q    So you never went to the Assistant U.S. Attorney here

20    and said, there's mistakes in these reports, did you?

21    A    No.

22    Q    It's true, is it not, that yesterday when you testified

23    about who you talked to and who talked to you, you never

24    once mentioned the name Paul Musaelyants, did you?

25         You never once mentioned his name, did you?  Did

1    you?

2    A   I guess not.

3    Q   And so it's only in these reports where you said

4    anything about Paul Musaelyants, right?

5    A   I believe so.

6    Q   And when you got here on the stand, instead of

7    mentioning Musaelyants being involved in these things, you

8    blamed it all on Mr. Yelaun, didn't you?

9    A   I believe I mentioned Paul Musaelyants yesterday.

10   Q   Well --

11   A   I think I did.

12   Q   You agree -- no.  You told us his brother was running a

13   clinic in Worcester, didn't you?

14   A   Once again I'd have to go through -- I don't know.  Did

15   I not mention him otherwise?

16   Q   You never mentioned that Mr. Musaelyants, Paul

17   Musaelyants, came and asked you to sign reports, did you?

18   A   I guess not.

19   Q   And back in August of 2002 when the government agents

20   were asking you about the prescriptions and the reports, you

21   said that it was Mr. Yelaun and Mr. Musaelyants who came to

22   you and asked you to sign prescriptions and reports, didn't

23   you?

24   A   That would have to be clarified.  I believe they were

25   asking me about the reports.

1    Q    You agree that the agent's report says "prescriptions

2    and reports," doesn't it.

3    A    That's what it says.

4                   THE COURT:  We're going to take the morning

5    recess at this stage.

6                You may step down for the time being, Doctor.

7                We will be in recess for 20 minutes; so 25 before

8    12.

9                   THE CLERK:  All rise for the jury.

10               (Whereupon, the jury left the courtroom.)

11                  THE COURT:  Approximately how much longer on

12   recross?

13                  MR. JONATHAN SHAPIRO:  Not very much.

14                  THE COURT:  And then the next witness?

15                  MR. WEINREB:  Next witness is Ed Curley, who's

16   an insurance company witness, and we have hopefully --

17                  THE COURT:  His direct?

18                  MR. WEINREB:  His direct will be 15 minutes at

19   the most.

20                  THE COURT:  And then?

21                  MR. WEINREB:  Wanda Gonzales, who's a patient.

22   Her direct will be 15 minutes at the most.

23                  THE COURT:  After her?

24                  MR. WEINREB:  That depends on whether -- I

25   proposed to Mr. Shapiro a stipulation with respect to the

PDF created with pdfFactory trial version www.pdffactory.com

1    next insurance company witness.  I haven't heard back from

2    him yet.

3              MR. JONATHAN SHAPIRO:  I haven't really had a

4    chance to --

5              THE COURT:  You will during the break, I take

6    it.

7         There is another issue, counsel.  That is, that I

8    have not received any requests for instructions to the jury

9    from either side that I'm aware of.  If you are going to

10   submit them, I want them no later than the end of business

11   tomorrow, Wednesday.

12             MR. WEINREB:  Very well, your Honor.

13        The Court had indicated that we don't need to

14   submit the standard ones.

15             THE COURT:  No, you don't need to submit the

16   boilerplate instructions, but I would appreciate any efforts

17   on your part on all of the sundry legal questions that we

18   have in connection with the verdict form.

19             MR. WEINREB:  Very well, your Honor.

20             THE COURT:  We will be in recess until 25 of.

21             THE CLERK:  All rise.

22        (Recess.)

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                            **I N D E X**

2

3   **WITNESS:**                    **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**

4

5   JOHN MONTONI, resumed

6     By Mr. Jonathan Shapiro            6                    64

7     By Mr. Weinreb                            54

8

9                        E X H I B I T S

10                          NONE

11

12                        * * * * *

13                  **C E R T I F I C A T E**

14

15        I, James P. Gibbons, Official Court Reporter for

16   the United States District Court for the District of

17   Massachusetts, do hereby certify that the foregoing pages

18   are a true and accurate transcription of my shorthand notes

19   taken in the aforementioned matter to the best of my skill

20   and ability.

21

22

23              JAMES P. GIBBONS, CSR, RPR, RMR
                   Official Court Reporter
24               1 Courthouse Way, Suite 7205
                 Boston, Massachusetts 02210
25                    (617) 428-0402