# United States Court of Appeals
## For the First Circuit

No. 07-1651

UNITED STATES OF AMERICA,

Appellee,

v.

SEVERIN YELAUN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M Gorton, <u>U.S. District Judge</u>]

Before

Torruella and Boudin, and Dyk,˙
<u>Circuit Judges</u>.

<u>Dana A. Curhan</u> for appellant.
<u>Mark T. Quinlivan</u>, Assistant United States Attorney, with
whom <u>Michael J. Sullivan</u>, United States Attorney, was on brief
for appellee.

August 27, 2008

˙Of the Federal Circuit, sitting by designation.

**BOUDIN, Circuit Judge.** Severin Yelaun appeals from his conviction in the federal district court for various federal fraud related offenses committed during a scheme to collect insurance payments for medical tests. He also contests his sentence. The events that gave rise to the charges, drawing the facts primarily from the government's evidence at Yelaun's trial, are as follows.

In 1998 Yelaun and Igor Moyseyev started a clinic in Massachusetts -- Broadway Physical Therapy and Rehabilitation, Inc. ("Broadway") -- to provide physical therapy and diagnostic services primarily to auto accident victims. Moyseyev provided the funding, while Yelaun recruited physicians and supervised most of the day-to-day operations including billing matters; an affiliate, Global Tech Diagnostics ("Global Tech"), was incorporated to handle administrative matters including billing insurers for Broadway's services.

Two of the tests used by Broadway are important to this case. One, the electromyogram ("EMG"), measures nerve and muscle function and, as it involves insertion of needles into the patient and real time interpretation, requires that a physician be present. The second, called a nerve conduction velocity test ("NCV"), also measures nerve and muscle function but employs electrodes rather than needles. For insurance purposes it requires a prescription or request from a doctor, as does an EMG, but unlike the EMG does not require the doctor's presence at the test.

-2-

Although Broadway did some legitimate testing, it also billed auto insurers for numerous EMG and NCV tests that were not in fact performed. The EMG tests were commonly painful; the NCV tests involved shocks that could be painful. At Yelaun's trial a number of the patients for whom insurance reimbursement had been sought by Global Tech for such tests testified that they had gone to Broadway for therapy but had no recollection of the needle insertion or electric shocks that were the respective hallmarks of the two tests.

A doctor affiliated with Broadway, Dr. Ranendra Chatterjee, testified that his signature stamp had been used without authorization to stamp prescriptions for the tests and test reports; he said that he had never used the stamp for tests he had conducted or reviewed. Dr. David Tamaren, who worked part-time at Broadway, did not testify but prescriptions he wrote for EMG and NCV tests were introduced. The government argued from internal evidence that the prescriptions were written after the fact or were otherwise fraudulent.

In mid-1999, Dr. Chatterjee discovered the misuse of his stamp and confronted Yelaun, who (Dr. Chatterjee said) admitted that the stamp had been used "quite a few times" without the doctor's authorization. Dr. Chatterjee complained to Moyseyev and soon thereafter Moyseyev severed his ties with Yelaun. In November 1999, Yelaun with a new partner formed a new pair of companies --

-3-

Orthopedic Physical Therapy & Rehabilitation Center as the provider and Lynn Diagnostics Management for billing -- at a new location. Dr. John Montoni, a chiropractor who had worked at Broadway and followed Yelaun to the Lynn clinic, testified at trial that he had written prescriptions for EMG and NCV tests that had never been performed. The same pattern of billing insurers for tests never performed was thus repeated at least until some time in 2001 or 2002.

In January 2005, Yelaun, Moyseyev, Dr. Montoni, and Dr. Tamaren were indicted on numerous counts including mail fraud, 18 U.S.C. § 1341 (2000), wire fraud, id. § 1343, health care fraud, id. § 1347, conspiracy to commit an offense against or defraud the United States, id. § 371, money laundering, id. § 1956(a)(1)(A)(i) and money laundering conspiracy, id. § 1956(h). Yelaun's co-defendants accepted plea bargains but Yelaun went to trial and was convicted on twenty-six counts of mail fraud and one count each of health care fraud, conspiracy to commit an offense against the United States, and money laundering conspiracy.

Following his sentencing -- which yielded a sentence of fifty-one months in prison, a term of supervised release, and restitution of $88,800.84 -- Yelaun filed the present appeal. He does not contest the sufficiency of the evidence but challenges the admission of evidence against him, asserts a fatal variance as to

-4-

one count of the indictment and contests his sentence. The standard of review for his claims varies with the issue.

Yelaun first says that certain trial testimony by Dr. Montoni was admitted in error. Dr. Montoni testified that on a specific occasion Yelaun approached him with a box of patient charts and asked him to sign prescriptions for EMG and NCV tests for those patients. The tests had already been performed, and Dr. Montoni therefore signed the forms without assessing whether the patients needed the tests or not. Yelaun objects only to the doctor's further testimony that he signed the prescriptions as Yelaun requested because he felt intimidated by Yelaun.

Specifically, over objection Dr. Montoni was allowed to explain that his reason for signing the prescriptions for tests that he had not authorized was that Yelaun frightened him because, on a prior occasion, Yelaun had showed anger when Dr. Montoni had resisted doing what Yelaun wanted. Yelaun says that the testimony was irrelevant except for the forbidden inference of bad character, see Fed. R. Evid. 404(a), and was in any case highly prejudicial and therefore inadmissible, Fed. R. Evid. 403. We will assume arguendo that the objections were all properly preserved.

With limited exceptions, evidence to show the defendant's bad character is normally inadmissible in a criminal trial; but the very same facts illustrating bad character can be admitted, with a limiting instruction if sought, to show something else that is

-5-

relevant to the case. Fed. R. Evid. 404(b). In this instance, the government had ample legitimate reason to explain why at Yelaun's behest Dr. Montoni signed prescriptions for tests that he had not determined to be medically necessary.

Absent some explanation as to why Dr. Montoni willingly participated in a fraud at Yelaun's request, a jury might well infer that Dr. Montoni was not credible but had made up the story to secure his plea bargain. Inevitably, defense counsel was going to seek to impeach the doctor based on his own plea bargain with the government -- and also with Dr. Montoni's initial statements to police that he could not remember signing the EMG and NCV prescriptions. Both the admitted fraud and the initial denials underscored doubts about his credibility.

The explanation given by Dr. Montoni -- that he was afraid of Yelaun based on Yelaun's prior exhibitions of temper -- tended to make Dr. Montoni's main testimony about Yelaun's demand more plausible, countering any inference that Dr. Montoni's signatures had been supplied on his own and without Yelaun's involvement. The context also tended to counter any potential inference that Dr. Montoni -- who had in some instances properly prescribed such tests for patients -- was simply confused or mistaken about the episode in question.

Case law supports the relevance and admissibility of such contextual testimony. United States v. Bartelho, 129 F.3d 663, 676

(1st Cir. 1997), cert. denied, 525 U.S. 905 (1998) (allowing defendant's girlfriend to testify that she was intimidated by him to explain why she initially lied to the police and committed perjury); cf. United States v. Balsam, 203 F.3d 72, 85 (1st Cir.), cert. denied, 531 U.S. 852 (2000) (defendant's former girlfriend allowed to testify that she feared him to explain her reluctance to testify). In any event, the evidence was logically relevant for a reason other than bad character, which is Rule 404(b)'s ultimate test.

Of course, relevant evidence can be excluded under Rule 403 if it is substantially more prejudicial than "probative" (i.e., tending to prove a fact in issue), but this is a fact-specific balancing judgment by the trial judge reviewed only for abuse of discretion. United States v. Rodriguez-Estrada, 877 F.2d 153, 155-56 (1st Cir. 1989). In this case, the fact that Yelaun had a bad temper and that Dr. Montoni feared him was relevant and at best minimally prejudicial: the crime charged, after all, was fraud, not assault, and bad temper does not normally suggest a propensity to commit fraud.

Yelaun's more interesting claim of error is that there was a variance between the indictment's count 43, which charged him with conspiracy to commit money laundering, and the proof at trial. Count 43, on which Yelaun was convicted, charged that from in or about January 1999 through in or after 2002, Yelaun and Moyseyev:

-7-

did knowingly and unlawfully conspire with each other and with others known and unknown to the Grand Jury, knowingly to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is, to engage in financial transactions involving United States currency and bank checks, which in fact involved the proceeds of specified unlawful activity, that is, Mail Fraud in violation of Title 18, United States Code, Section[] 1341, Wire Fraud in violation of Title 18, United States Code, Section 1343, and Health Care Fraud in violation of Title 18, United States Code, Section 1347, with intent to promote the carrying on of said specified unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of that specified unlawful activity, and knowing, while conducting and attempting to conduct such financial transactions, that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(A)(i) and (B)(i).

The substantive money laundering counts (counts 44 to 58) identified checks that Global Tech gave Symco Medical Billing, an outside collection agency hired by Global Tech and Lynn to handle some billing and collections, and two checks to Global Tech's accountant. At trial, the government dismissed the substantive money laundering counts. To prove count 43, the government introduced Global Tech checks given to Broadway employees and to Yelaun for legitimate purposes (e.g., as salary checks).

Yelaun's objection, at trial and on appeal, is that the use of the employee checks was a "variance" from the indictment

-8-

because count 43 had (although not expressly so) relied only upon the checks paid to Symco and the Global Tech accountant identified in withdrawn counts 43-58, which charged specific acts of money laundering. Yelaun does not dispute that the employee checks were a rational means of showing both the laundering of the funds and their use to promote the enterprise, just as charged in the indictment. The objection is to the alleged variance.

A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment. United States v. Mueffelman, 470 F.3d 33, 38 (1st Cir. 2006). A variance does not warrant reversal unless it is prejudicial, e.g., by undermining the defendant's right "to 'have sufficient knowledge of the charge against him . . . to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense.'" United States v. DeCicco, 439 F.3d 36, 47 n.4 (1st Cir. 2006) (quoting United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir.), cert. denied, 506 U.S. 866 (1992)).

Here, there was no variance at all, prejudicial or otherwise. Count 43 did not identify any checks or other transactions as the basis for that count. The defense could have sought a bill of particulars to identify specific transactions, United States v. Barbato, 471 F.2d 918, 921 (1st Cir. 1973), but it did not. At best, the defense could merely have assumed -- wrongly

-9-

as it turned out -- that the government would rely on transactions mentioned in the substantive money laundering counts to prove the conspiracy. Using different transactions did not "vary" any proof promised by count 43 because the count identified no specific transactions.

Relatedly, Yelaun says that he was unfairly surprised by the use of the employee checks because the government misled him by telling him it was going to rely on the checks listed in the substantive money laundering counts to prove count 43. No support for this claim is supplied; in fact, the government produced the checks to employees in pretrial discovery, listed them as exhibits to be introduced, and argued in its opening that it would be relying on the checks to employees to prove count 43.

Further, when Yelaun objected to the offer of the employee checks, government counsel at sidebar said that the prosecution had explicitly told Yelaun's counsel that the government intended to rely on the employee checks to prove count 43; nothing indicates that defense counsel disputed this assertion. If the defense wanted a formal inquiry into the matter of representations, or a delay in the trial to counter the supposed surprise evidence, the time to ask was at the trial. United States v. Wright, 573 F.2d 681, 685 (1st Cir.), cert. denied, 436 U.S. 949 (1978); United States v. Antonelli, 439 F.2d 1068, 1070 (1st Cir. 1971). No such request was made.

Finally, Yelaun challenges two sentencing enhancements adopted by the trial judge in calculating the guideline range for Yelaun's sentence. Using the 2002 version of the guidelines, the judge adopted an adjusted offense level of twenty-four which, with Yelaun's criminal history level I, yielded a guideline range of fifty-one to sixty-three months. Yelaun's fifty-one month sentence was at the bottom of the range. A mistake in calculating the range could conceivably have affected the sentence, but there was no mistake.

In finding an offense level of level twenty-four, the district judge identified a base offense level of six for fraud, U.S.S.G. § 2B1.1(a), and then added a ten level enhancement for causing an amount of loss between $120,000 and $200,000, U.S.S.G. § 2B1.1(b)(1)(F), a two level enhancement for a scheme involving more than ten but less than fifty victims, U.S.S.G. § 2B1.1(b)(2)(A)(i), a four level enhancement based on Yelaun's role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, U.S.S.G. § 3B1.1(a), and a two level enhancement for obstruction of justice, see U.S.S.G. § 3C1.1.

Yelaun first challenges the amount-of-loss calculation on two different grounds -- one legal and one factual. His legal objection, which we review de novo, is that the judge rather than a jury found the facts establishing the amount of loss under the

-11-

guidelines and that this violates the Sixth Amendment. But United States v. Booker, 543 U.S. 220 (2005), resolved this concern by making the guidelines advisory. See United States v. Ziskind, 491 F.3d 10, 17 (1st Cir. 2007), cert. denied, 128 S. Ct. 1305 (2008). It is only where the findings at issue (here, the loss findings) raise the statutory maximum sentence or constitute an element of the crime that a jury finding is necessary. Booker, 543 U.S. at 230-37, 244; United States v. Bermudez, 407 F.3d 536, 545 (1st Cir.), cert. denied, 546 U.S. 921 (2005). Neither is true in this instance.

Yelaun's factual challenge to the computation is that the evidence failed to show a loss of at least $120,000. The district judge calculated the loss as $179,534.74, which reflected all EMG and NCV tests billed by Global Tech or Lynn Diagnostics with test reports were signed by Dr. Montoni or stamped with Dr. Chatterjee's signature stamp. Conceding that the EMG losses were proven, Yelaun says that there was insufficient evidence that the NCV tests were not performed. Review is for clear error. United States v. Phaneuf, 91 F.3d 255, 261 (1st Cir. 1996).

Dr. Chatterjee testified that he never authorized the use of, nor in fact used, his signature stamp to sign any NCV reports, so any NCV reports bearing his signature stamp were based on fraudulent documents. Dr. Montoni was not authorized to perform NCV tests and testified that he had never performed any such tests,

and that he did not know whether the tests in the reports he signed had been performed. Thus, insurance claims based on test reports bearing his signature were supported by fraudulent documents. This would be enough standing alone to support the loss finding, but there is more.

Dr. Montoni testified that several of the tests bearing his signature were identical for different patients, a virtual impossibility if the tests were legitimate. Dr. Chatterjee similarly testified that some patients' reports bearing his signature stamps were identical and that Global Tech had billed for up to fifteen tests signed by him in a day, which he testified he had not performed. All this, with the patient testimony as well, provided more than enough evidence to support the loss calculation adopted by the district judge.

Yelaun also disputes the four level enhancement for being a leader or organizer of a conspiracy that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1. He contests both prongs of the enhancement, arguing that he was not an organizer or leader of the conspiracy and that the conspiracy did not involve five or more participants and was not otherwise extensive. As to the second prong, a finding that the conspiracy was otherwise extensive was sufficient with or without five participants.

-13-

Yelaun's argument as to his role as an organizer or leader is, in essence, that he was a subordinate of Moyseyev, who controlled Broadway and who ultimately fired Yelaun. In fact, the testimony at trial showed that Yelaun played a major role at Broadway in its day-to-day operations. He had greater knowledge of the business than Moyseyev and was in charge of finding doctors, scheduling, running the billing and training the administrative staff. See U.S.S.G. § 3B1.1, cmt. 4 (setting forth criteria for leader or organizer; more than one individual can so qualify).

As to Lynn Diagnostics, it appears that Yelaun's control was at least as great as at Broadway. He recruited Drs. Tamaren and Montoni for the new enterprise, ran the billing and seems to have generally been running the day-to-day operations. The outside billing company he worked with believed he owned Lynn. Even with fewer specifics, it would be a fair inference that his importance and role were at least as significant in the new and smaller company as in its predecessor.

Yelaun says that in determining that the conspiracy was extensive, the judge conflated the two different enterprises successively operated by Yelaun; but each involved the services of numerous employees and a fairly complex scheme, involving falsifying medical reports and prescriptions and follow up billings based on that false documentation. Cf. United States v. Twitty, 72 F.3d 228, 234 (1st Cir. 1995). Either scheme could be considered

-14-

"otherwise extensive" in its own right.  So the enhancement was proper regardless of the number of employees.

     Affirmed.